ROBERT A. WHITE, JR. *v.* COMMISSIONER
OF CORRECTION
(AC 33833)

Bear, Sheldon and Harper, Js.

Argued March 19—officially released September 24, 2013

*Heather Golias*, assigned counsel, for the appellant (petitioner).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Eva B. Lenczewski*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Robert A. White, Jr., appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the habeas court erred by holding that he failed to prove ineffective assistance of trial counsel with respect to counsel's alleged failure to: (1) advise the petitioner adequately regarding a nolo contendere plea and to negotiate and secure a plea under *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), with the same agreed upon sentence as he would have received on his plea of nolo contendere; (2) object to or move to strike certain testimony; (3) request a jury instruction on prior misconduct evidence; (4) object to the state's closing argument; and (5) present evidence and advise the petitioner during sentencing. We affirm the judgment of the habeas court.

This court has previously set forth the following facts that the jury reasonably could have found at the petitioner's underlying criminal trial. "The [petitioner] was the brother-in-law of the victim's[1] best friend and was known to the victim from prior social gatherings. On

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

the evening of July 6, 1996, the [petitioner] arrived at the victim's residence unannounced. The victim, a thirty-two year old female, was home with one of her daughters. The [petitioner] was very upset and crying because he and his wife had been arguing. He explained to the victim that his wife had banished him from their residence, and that he had been sleeping at work and in his truck and needed a shower. The victim admitted the [petitioner] into her residence and allowed him to use the shower. She did not feel threatened by the [petitioner] because she knew him.

"After showering, the [petitioner] stated that he needed a place to sleep, and the victim told him that he could stay for one week and sleep on a couch. Shortly thereafter, the [petitioner] informed the victim that he was leaving to attend a party. The [petitioner] did not return until 9:30 the following morning.

"On July 7, 1996, after the victim's daughter left to visit with her father, the [petitioner] and the victim began discussing his marital problems. As the conversation progressed, the [petitioner] began what the victim described as sexual talk and offered to give the victim a massage, which she declined. Later that day, the [petitioner] resumed the 'sexual talk' in a suggestive tone that caused the victim to feel uncomfortable. At one point, the victim went outside to avoid the [petitioner]. The [petitioner] followed her, however, and continued talking in a sexually suggestive manner. The victim ignored him but felt he was staring at her. The [petitioner] again sought to give the victim a massage and she again refused.

"The victim went back inside and was followed by the [petitioner]. The [petitioner] approached the victim from behind and began groping her and fondling her breasts. The victim asked, '[W]hat are you doing?' and the [petitioner] pushed her onto the couch, pinning her

arms behind her. In the process, the [petitioner] fell onto the couch with her, and his weight and leverage held the victim against the couch, rendering her immobile. The [petitioner] had a 'very mean look' on his face, removed the victim's shorts, forcibly held her legs down and performed cunnilingus on her. After the [petitioner] stopped, he stood and started to remove his clothing. The victim was dazed when she got up from the couch and tried to walk toward the bathroom, but the [petitioner] guided her into the bedroom, pushed her onto the bed and engaged in vaginal intercourse.

"During this ordeal, the victim was horrified and experienced great pain. Finally able to free herself, she ran into the bathroom and ordered the [petitioner] to leave. The victim was initially reluctant to contact the police, fearing that the [petitioner] would harm her. After contacting a friend and a rape crisis center, she notified the police later that same day." *State* v. *White*, 55 Conn. App. 412, 414–15, 740 A.2d 399, cert. denied, 252 Conn. 908, 743 A.2d 621 (1999).

The petitioner was charged with two counts of first degree sexual assault in violation of General Statutes § 53a-70 (a) (1). Attorney Lawrence Hopkins represented the petitioner throughout the proceedings. On September 30, 1997, after jury selection had begun, the petitioner came before the court, *Iannotti, J.*, to enter a nolo contendere plea to one count of first degree sexual assault in exchange for an agreed sentence of eight years incarceration, suspended after service of three and one-half years, followed by ten years probation. During the canvass, the petitioner indicated that he understood what he was doing in entering a nolo contendere plea and that he had had enough time to discuss his plea with counsel, including the state's evidence against him, the elements of the crime, and the potential exposure to increased punishment if he were found guilty at trial of first degree sexual assault. The

petitioner, however, then decided to take the matter to trial, at which time the nolo contendere plea was withdrawn and jury selection recommenced.

At trial, the state presented testimony from, inter alios: the victim; Samuel Siegler, the emergency room physician who treated the victim after the incident; Gabriel Hakim, the victim's personal physician; and Laura Harrison, a detective with the Naugatuck Police Department. "The [petitioner], who had four prior felony convictions, admitted at trial that he performed cunnilingus and engaged in vaginal intercourse with the victim, but claimed that their encounter was consensual. The jury found the [petitioner] guilty of [both] counts of first degree sexual assault." Id., 416. The court, *Espinosa, J.*, sentenced the petitioner to a total effective term of thirty years incarceration, suspended after service of twenty years, followed by ten years probation.

On May 15, 2000, the petitioner filed a petition for a writ of habeas corpus. In his fifth amended petition, filed February 22, 2011, the petitioner raised, in three separate counts, claims of ineffective assistance of trial counsel, conflict of interest of trial counsel and prosecutorial impropriety. The matter proceeded to trial on May 4, 2011, at which time the petitioner presented his own testimony as well as that of Attorney Hopkins. The habeas court, thereafter, denied the petition.[2] This appeal followed.

On appeal, the petitioner claims that the court erred by holding that he did not prove ineffective assistance of trial counsel with respect to counsel's alleged representation of him in five general respects. "Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts

---

[2] The habeas court granted the petition for certification to appeal.

found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given their testimony." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 125 Conn. App. 57, 61–62, 6 A.3d 213 (2010), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011).

"The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the federal constitution, and by article first, § 8, of the constitution of Connecticut. In *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 798, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004).

With respect to the performance component of the *Strickland* test, "[t]o prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. . . . Competent representation is not to be equated with perfection. The

constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted; internal quotation marks omitted.) Id., 798–99. "Nowhere is it said, though, that such a presumption is irrebuttable. As with any refutable presumption, the petitioner may rebut the presumption on adequate proof of sufficient facts indicating a less than competent performance by counsel." *Sanders* v. *Commissioner of Correction*, 83 Conn. App. 543, 551, 851 A.2d 313, cert. denied, 271 Conn. 914, 859 A.2d 569 (2004).

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Citation omitted; internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, supra, 80 Conn. App. 799.

We also note that "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Britton* v. *Commissioner of Correction*, 141 Conn. App. 641, 649, 61 A.3d 1188, cert. denied, 308 Conn. 946, 67 A.3d 290 (2013).

I

We first address the petitioner's claim that the court erred by holding that he did not show ineffective assistance of trial counsel with respect to counsel's alleged failure to advise him adequately on a nolo contendere plea and to negotiate and secure a plea under *North Carolina* v. *Alford*, supra, 400 U.S. 25, with the same agreed upon sentence as he would have received on his plea of nolo contendere. We disagree.

The following additional facts are necessary for our resolution of this claim. Before the plea canvass of the petitioner, the clerk read the charge of sexual assault in the first degree to which the petitioner pleaded nolo contendere. The prosecutor then set forth in great detail the factual basis of the charge. The petitioner's plea canvass then occurred.

During the plea canvass, the court asked the petitioner, inter alia, if he was satisfied with Attorney Hopkins' representation of him and he answered in the affirmative. The court also asked whether the petitioner believed that his trial counsel had done everything he should have done to protect his legal rights and interests, and the petitioner nonresponsively replied: "I just, I don't feel that I, I don't feel I'm guilty of this crime, and I don't feel that it could have been proven. If I wasn't guilty, it wouldn't be proven." The court then asked the petitioner if he would like to withdraw his plea, to which he responded: "I'll take the sentence that was suggested." The court continued: "Now, listen, you pled nolo contendere. That means no contest. [Attorney] Hopkins is here. [Attorney] Hopkins is ready, willing, and able and more than capable to continue with jury selection of your case and take the jury case to conclusion, whatever that result might be. He can't tell you, sir, what a jury is going to do. No one can tell you that. But my last question to you was, do you feel up to this point he's given you all of the information and has done everything he can to protect your legal rights and interests?" The petitioner responded in the affirmative, and the court eventually continued: "Do you understand my meaning of nolo contendere, you're giving up certain of your legal rights, the right to a trial by the court or jury with the assistance of an attorney? You understand you've given that up by your nolo contendere plea?" The petitioner responded that he understood but then stated: "I've got to take this to trial because I'm not guilty, damn it." At that time, the plea was withdrawn and the matter continued for jury selection.

During the habeas trial, Attorney Hopkins testified as follows. On September 30, 1997, he and the petitioner discussed the possibility of resolving the case by pleading to one count of first degree sexual assault in

exchange for an agreed upon sentence of eight years incarceration, suspended after service of three and one-half years, followed by ten years probation. He was attempting to secure a nolo contendere plea for the petitioner because it would not be an admission of guilt for the purposes of a subsequent civil proceeding. He explained to the petitioner the difference between a nolo contendere plea and a guilty plea and believed that he explained an *Alford* plea as well. He believed that the court would have accepted any form of guilty plea, but that the petitioner would have been unable to get through the canvass because he claimed that "he wasn't guilty and that the state did not have sufficient evidence to prove his guilt." Attorney Hopkins recalled "begging" the petitioner to resolve the matter by a plea but that the petitioner was not amenable to it. Attorney Hopkins testified: "I remember that specifically, telling him not to do it. He was insistent. I talked to him about it after we recessed, at the conclusion of that hearing, and he wanted no part of it. He wanted a trial."

In response to questions about an *Alford* plea, in particular, Attorney Hopkins testified that he understood the petitioner's proclamations of innocence to be consistent with an *Alford* plea, but believed that an *Alford* plea was not barred from admission as evidence in a civil proceeding and that a factual basis was required for the plea. Ultimately, however, Attorney Hopkins testified that he was not concerned with these issues, as the petitioner could not get through an *Alford* plea because "in order to get through an *Alford* plea, any defendant has to tell the court that there's a substantial likelihood, based on the evidence as he understands it, that he will be convicted after a trial, even though he maintains his innocence. There's no way he could have gotten through that portion of an *Alford* plea . . . based on his understanding of the facts and the force of the evidence."

The petitioner testified as follows. He believed that he was entering an ordinary guilty plea. Attorney Hopkins did not explain to him an *Alford* plea. If he had understood the parameters of an *Alford* plea, he would have entered such a plea and agreed to the recommended sentence, but Attorney Hopkins did not attempt to secure an *Alford* plea. He did not recall Attorney Hopkins trying to make him reconsider after the change of plea hearing and would have liked to discuss the matter further. The petitioner testified: "If I would have been able to plead guilty and maintain my innocence, I would have opted for that. I would have pled guilty and . . . if we could have just talked about it and got it to where I understood it, I would not have been opposed to that, to a different type of plea." The petitioner acknowledged, however, that he had difficulty accepting that the state had enough evidence to prove him guilty at trial.

The habeas court concluded "that the petitioner has failed to show that Attorney Hopkins rendered deficient performance. The credible evidence supports the conclusion that Attorney Hopkins properly advised the petitioner regarding his nolo contendere plea. Although nolo contendere and *Alford* pleas are functional equivalents, potential subsequent legal consequences or liability may not be identical. For the instant purpose of determining whether Attorney Hopkins failed to secure an *Alford* plea, the court is unable to discern any legally meaningful distinctions between nolo contendere and *Alford* pleas. Both types of pleas are forms of guilty pleas. The petitioner now contorts his continuing protestation of innocence into an assertion that he would have entered an *Alford* plea because he thereby would have been able to maintain an aura of innocence while obtaining the benefit of a lower sentence. The transcript of the plea canvass completely undermines this claim. The petitioner explicitly told Judge Iannotti that the

state did not have enough evidence to prove him guilty. Such a position made an *Alford* plea impossible." (Footnote omitted.) See *State* v. *Palmer*, 196 Conn. 157, 169 n.3, 491 A.2d 1075 (1985) ("[a] guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless").

The habeas court continued: "The petitioner chose, against the advice of counsel, to proceed to trial because he maintained his plea of not guilty, wanted to hold the state to its burden of proof and have the matter tried to a jury because he maintained his innocence. The adamancy of the petitioner's insistence of his innocence and compulsion to take the matter to trial belie his present claim that he would have pleaded guilty under the *Alford* doctrine. The petitioner has, therefore, failed to show both deficient performance and prejudice . . . ."

The petitioner argues that an *Alford* plea is, and was at the time of his change of plea hearing, the functional equivalent of a nolo contendere plea because neither is admissible in civil litigation nor requires a factual basis. The petitioner contends, in this regard, that his protestations of innocence at his change of plea hearing were consistent with the requirements for an *Alford* plea, that he was satisfied with the proposed sentence, which the court would have accepted under an *Alford* plea, but that trial counsel failed to negotiate and secure an *Alford* plea for him on the apparently mistaken belief that an *Alford* plea was admissible in civil litigation and required a factual basis. We are not persuaded.

"[E]ffective assistance of counsel includes counsel's informed opinion as to what pleas should enter." (Internal quotation marks omitted.) *Peterson* v. *Commissioner of Correction*, 142 Conn. App. 267, 273, 67 A.3d

293 (2013). "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." (Internal quotation marks omitted.) Id. The ultimate decision on how to plead, however, must be made by the defendant, "[a]nd a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." (Internal quotation marks omitted.) Id., 274. The petitioner's claim concerns the law governing pleas at the time of the petitioner's change of plea hearing on September 30, 1997, and Attorney Hopkins' understanding thereof.[3]

---

[3] "Under *North Carolina* v. *Alford*, [supra, 400 U.S. 25], a criminal defendant is not required to admit his guilt, but consents to being punished as if he were guilty to avoid the risk of proceeding to trial." *Commissioner of Correction* v. *Gordon*, 228 Conn. 384, 385 n.1, 636 A.2d 799 (1994). "A guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless." *State* v. *Palmer*, supra, 196 Conn. 169 n.3. "In *North Carolina* v. *Alford*, supra, the United States Supreme Court treated such guilty pleas as the 'functional equivalent' of a plea of nolo contendere." *State* v. *Rish*, 17 Conn. App. 447, 456, 553 A.2d 1145, cert. denied, 211 Conn. 802, 559 A.2d 1137, cert. denied, 493 U.S. 818, 110 S. Ct. 72, 107 L. Ed. 2d 38 (1989).

Our Supreme Court has indicated that "[a] plea of nolo contendere has the same legal effect as a plea of guilty on all further proceedings within the indictment. . . . The only practical difference is that the plea of nolo contendere may not be used against the defendant as an admission in a subsequent criminal or civil case." (Citations omitted.) *State* v. *Martin*, 197 Conn. 17, 20–21 n.7, 495 A.2d 1028 (1985). Our Supreme Court has also indicated that "a factual basis is not required to be established to accept a nolo contendere plea." *State* v. *Godek*, 182 Conn. 353, 364, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981).

In 1989, this court concluded in *Rish* that "[a]s a guilty plea under the *Alford* doctrine is the 'functional equivalent' of a plea of nolo contendere, an *Alford* plea may not be used against the defendant as an admission in a subsequent civil case." *State* v. *Rish*, supra, 17 Conn. App. 456. Likewise, in 2002, this court concluded that as "*Alford* pleas and pleas of nolo contendere [are] the 'functional equivalent' of one another . . . a factual basis is not required for *Alford* pleas . . . ." (Citations omitted.) *Baillargeon* v. *Commissioner of Correction*, 67 Conn. App. 716, 730 n.11, 789 A.2d 1046 (2002). "A court may nevertheless, in its discretion, require a factual basis

We recognize that, in 1997, neither a nolo contendere plea nor an *Alford* plea could be used against the petitioner as an admission of guilt in a subsequent civil case. See footnote 3 of this opinion. We further recognize that a factual basis was not required for a nolo contendere plea, although, in 1997, there was no definitive authority that a factual basis was not required for an *Alford* plea. See id. In any event, the court, in its discretion, could require a factual basis as was presented in this case before accepting a nolo contendere plea. See id.; *State* v. *Godek*, 182 Conn. 353, 365 n.13, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981). Attorney Hopkins' testimony reveals that he was not fully apprised of the parameters and nature of nolo contendere and *Alford* pleas in 1997. Nevertheless, the habeas court was free to credit his testimony over that of the petitioner, which was that Attorney Hopkins had advised the petitioner to enter a nolo contendere plea but that the petitioner was not amenable to it. The record reveals that Attorney Hopkins negotiated a nolo contendere plea in order for the petitioner to avoid greater exposure at trial and without risking that the plea could be used against him as an admission in a subsequent civil case. The petitioner, because of his belief in his innocence and in the weakness of the state's case, was unable to complete the nolo contendere plea canvass, however, indicating at one point that he did not "feel that [the crime] could have been proven" and ultimately stating: "I've got to take this to trial because I'm not guilty, damn it." Although a factual basis was not required for a nolo contendere plea, the trial court was free to require one in the form of a recapitulation of substantially all of the evidence underlying the state's claim against him before accepting a negotiated plea. See footnote 3 of this opinion; *State* v. *Godek*, supra, 365 n.13.

before accepting a nolo contendere or *Alford* plea." Id., 730 n.10; see also *State* v. *Godek*, supra, 182 Conn. 365 n.13.

We also recognize, as did the habeas court, that there is no meaningful, practical or legal distinction between a nolo contendere plea and an *Alford* plea for the purposes of this claim. The petitioner's inability to complete a nolo contendere plea due to his insistence on taking his case to trial and his inability to acknowledge the weight of the state's evidence against him, as recited by the prosecutor, made an *Alford* plea impossible. See *State* v. *Palmer*, supra, 196 Conn. 169 n.3 ("[a] guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but *acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless*" [emphasis added]). Along these lines, and in light of the petitioner's adamancy during his nolo contendere plea hearing as to his desire to proceed to trial, the habeas court did not credit his testimony that he would have pleaded guilty under the *Alford* doctrine had such a plea been negotiated. Ultimately, regardless of Attorney Hopkins' understanding of the parameters of the pleas, we conclude that the petitioner failed to demonstrate any prejudice resulting therefrom.

## II

We next address the petitioner's claim that the court erred by holding that he did not prove ineffective assistance of trial counsel with respect to counsel's alleged failure to object to or move to strike certain testimony. This claim essentially can be divided into three separate claims concerning (1) testimony as to the victim's medical history; (2) alleged "expert" testimony of lay witnesses about forcible sexual intercourse; and (3) testimony about the truthfulness of the victim.

The following additional facts are necessary for our resolution of these claims. At the petitioner's criminal trial, the victim testified on direct examination as follows. On July 7, 1996, the petitioner engaged in forcible

sexual intercourse with the victim that caused her "tremendous" and "[u]nbelievable" pain, which persisted thereafter. Previously, in June 1996, the victim was advised by her personal physician, Dr. Hakim, to abstain from sexual contact due to pain in her left side caused by a cyst on her left ovary, which, at the time, was her only remaining ovary. Dr. Hakim was afraid the cyst might rupture and was concerned that the victim might have to go on hormonal therapy. Two days after the incident, the victim went to the emergency room due to the pain she was experiencing and had her left ovary removed by Dr. Hakim. After the victim was asked if there were any other medical conditions that she could attribute to this incident, Attorney Hopkins objected to the victim's "rendering a medical opinion regarding any [e]ffect this incident may have had." The court sustained the objection.

On cross-examination, the victim testified that she was in the hospital for six days after the surgery and lost approximately six weeks of work. She indicated that she had been abstaining from sexual contact on advice from Dr. Hakim, who was trying to see if the cyst would shrink so the victim would not have to go on hormonal therapy. The victim further testified that, from what Dr. Hakim told her, she could have waited "quite a while" to have the surgery but now, due to the incident, had to undergo hormonal therapy. On redirect examination, the victim testified to her "long gynecological history" dating back to 1984 with an ectopic pregnancy and subsequent adhesions necessitating some five or six operations that involved the removal of her right ovary, uterus, cervix and fallopian tubes.

Dr. Siegler, the emergency room physician who treated the victim after the incident, testified on direct examination to the following. The victim reported pain in her lower abdomen on her left side, which elicited

significant pain on palpation. The prosecutor and Dr. Siegler then engaged in the following colloquy:

"Q. And if [the victim] had testified earlier with regard to experiencing excruciating pain during forcible sexual intercourse, what, given her history, could be the probable cause of that?

"A. Um, there could be pressure on the area of the cyst during that forcible penetration that could cause— it could conceivably cause pain from the cyst.

"Q. And that type of pain would be consistent with forcible sexual intercourse in your opinion within a reasonable degree of medical certainty?

"A. Yes. . . .

"Q. You detected an area of tenderness on the left side of [the victim]. Would that particular observation be consistent with forcible sexual intercourse in your opinion to a reasonable degree of medical certainty?

"A. It could be. Can be."

On cross-examination, Attorney Hopkins elicited testimony from Dr. Siegler that the tenderness or pain to which she testified also could be consistent with consensual sexual intercourse. Attorney Hopkins further elicited testimony from Dr. Siegler that, upon physical examination, there was no sign of trauma or physical injuries other than the tenderness. Attorney Hopkins and Dr. Siegler then engaged in the following colloquy:

"Q. And you saw this woman for thirty minutes?

"A. That's right.

"Q. And one can only assume that you spent a lot of that time doing the physical examination that you described?

"A. I spent—I'm sure I spent a good five or ten minutes just in dialogue and not on physical exam. And I think that although I'm not a psychiatrist, we practice a lot of psychiatry, so to speak, in the emergency room, and we have to assess people's mental status and their reliability, and we have to qualify our history based on the patient's reliability. And based on my perception of her mental status and her emotional state, I thought she was legitimate. That was my own opinion.

"Q. That's your opinion?

"A. Right.

"Q. And it's really just based on speculation because there is no physical evidence that she was physically?

"A. That's true.

"Q. There is none. Absolutely none. I mean we can agree on that, can't we?

"A. Yeah.

* * *

"Q. And so you speculate based on your observation of her demeanor that there may have been something true to what she was saying to you?

"A. That's correct. I felt her—that she was a reliable historian . . . .

"Q. So, your not having been at the scene of this incident, you are convinced by what you observed of her demeanor, not of her physically, but of her demeanor that this occurred? You can sit there under oath and tell the ladies and gentlemen of this jury that she was forcibly sexually assaulted based on what you observed in those thirty minutes?

"A. I could only say that she seemed like a reliable historian. I—there was, based on—you know, I—I don't

think I'm in a position to say whether it happened or not."

On redirect examination, Dr. Siegler further testified: "[I]n this particular situation, I was impressed to the point that I could say that she was reliable. . . . It just seemed like she was reliable . . . just based on my feeling, ah, just the way she came off that she seemed reliable . . . . You know, it seems as though she was telling the truth." Dr. Siegler further reiterated: "I think that as I mentioned before, her exam could have been consistent with, based on her physical exam outside of her mental status, seemed like it could be consistent with consensual sex or forced sex."

Dr. Hakim, the victim's personal physician, testified on direct examination to the following. The victim came to him in 1992 with complaints of pelvic and abdominal pain. He discovered that the victim had adhesions, which cause organs to stick together. On a few occasions, he had to operate on the victim to relieve the pain from the adhesions. Those surgeries included removal of the victim's right ovary and uterus. He did not remove her left ovary so that she could continue to have some hormonal function. On June 12, 1996, the victim visited Dr. Hakim complaining of lower left quadrant pain. He discovered the cyst on the left ovary but decided to wait and see whether the cyst got larger or smaller. Dr. Hakim recommended that the victim abstain from sexual intercourse or any other activities that might trigger pelvic pain. One day after the incident, the victim visited Dr. Hakim and informed him that she had been raped and continued to experience left lower quadrant pain. Dr. Hakim, however, did not perform an examination because the victim indicated that she had been examined the night before. One day later, the victim went to the emergency room complaining of very severe pain, and Dr. Hakim decided to perform more

surgery to determine the problem. The prosecutor and Dr. Hakim then engaged in the following colloquy:

"Q. What effect can forcible vaginal sexual intercourse have on adhesions in the pelvic area?

"A. It could make it worse. It could make the pain worse.

"Q. And what effect could forcible vaginal sexual intercourse have on an ovarian cyst?

"A. It could cause it to twist or it could cause it to rupture. . . .

"Q. And what procedures did you perform or become involved with on July 9?

"A. On July 9, I took [the victim] into the operating room and we started initially doing what we call laparoscopy, which is . . . making incisions, putting the camera inside to see what we are dealing with. At that time, she had horrendous amount of adhesions and I just couldn't see anything in the pelvis. There was no way we could visualize the pelvis to see what was wrong with the ovary, and I elected, at that time, to go inside and really, you know, to separate all the adhesions which are part of the patient's pain, and then to take a look at the ovaries, what's wrong with the ovary and then decide what to do.

"Q. And what was the ultimate result that was performed?

"A. I ended up removing that ovary.

"Q. And what are the permanent consequences to [the victim's] conditions?

"A. She's menopausal now and she's going to require hormonal therapy until she's probably about sixty years of age at least.

"Q. And do you have an opinion within a reasonable degree of medical probability as to whether sexual— forcible sexual intercourse on July 7 of 1996, could exacerbate [the victim's] medical condition to the point where she would require surgery two days later on the ninth?

"A. Certainly, forcible intercourse could worsen her adhesions with the symptoms. The pain could worsen. The pain could trigger towards her ovary. That's all I can say.

"Q. And on June 12 of 1996 when you had seen her prior to the assault, your hopes had been to prolong surgery for how long?

"A. Postpone surgery forever, if possible. I did not want to go in on [the victim] because, like I said, surgery can trigger more adhesions, so we tried to do surgery to alleviate something, but we know that it can make it worse, so we try to avoid it if we can help it, and that's why I was praying to God I didn't have to operate anymore on [the victim]."

On cross-examination, Attorney Hopkins elicited from Dr. Hakim that there was no way to tell whether intercourse would exacerbate her adhesions but that it could cause a twist of the ovarian cyst. Attorney Hopkins further elicited from Dr. Hakim that there was no way to tell whether a criminal incident exacerbated her condition. After closing arguments, the court, *Espinosa, J.,* instructed the jury that Dr. Siegler and Dr. Hakim were expert witnesses.

At the outset, we recognize that in order for any of these claims to have merit, the evidence must, at minimum, be inadmissible. Furthermore, we recognize that "[t]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency. . . . [T]here is a strong presumption

that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . . An [e]xperienced [litigator may] utilize the trial technique of not objecting to inadmissible evidence to avoid highlighting it in the minds of the jury." (Citation omitted; internal quotation marks omitted.) *O'Neil* v. *Commissioner of Correction,* 142 Conn. App. 184, 190, 63 A.3d 986, cert. denied, 309 Conn. 901 68 A.3d 656 (2013).

## A

Concerning testimony at trial, the petitioner first claims that the court erred by holding that he did not prove ineffective assistance of trial counsel on the basis of counsel's failure to object to testimony about the victim's medical history on the ground that it was more prejudicial than probative. We disagree.

During the habeas trial, Attorney Hopkins testified that he could not say what medical records were provided but remembered that the victim had gynecological problems that resulted in adhesions and periods of pain. With respect thereto, and Dr. Hakim's alleged advice to the victim to avoid sexual intercourse, Attorney Hopkins testified that he argued during the petitioner's criminal trial that the victim may have ignored Dr. Hakim's advice. Attorney Hopkins testified that he did not recall objecting to testimony regarding preincident surgery and did not recall receiving any discovery about postincident surgery. Furthermore, Attorney Hopkins testified concerning Dr. Siegler's testimony given at the petitioner's criminal trial that, with respect thereto, "[t]here was nothing about [the victim's] physical condition that could lead me to say that she was forcibly sexually assaulted or sexually assaulted at all."

The habeas court concluded that there were no valid reasons for Attorney Hopkins "to object to the medical history based on relevance grounds. Such evidence was

highly relevant to both sides. For the prosecution, the evidence buttressed the victim's testimony that she would not have consensual sex with the petitioner. For the defense, the history failed to prove that the sex between the victim and the petitioner was forced. In fact, it was so equivocal that it is inconceivable how any prejudice, if there even was any, outweighed its probative value. There is no merit to the claim that Attorney Hopkins rendered deficient performance by failing to object to medical history evidence and the prosecutor's use thereof during closing arguments."

The petitioner argues that the victim's medical history, presented by the state and argued during closing arguments, served only to unduly arouse the jury's emotions of sympathy toward her and prejudice the petitioner. The petitioner contends that there was no evidence that sexual intercourse caused the need for surgery to remove the victim's left ovary such that testimony about the surgery and the victim's previously diagnosed medical condition was not relevant and was more prejudicial than probative. The petitioner further contends that medical history dating back to 1984 was not needed for Dr. Hakim to testify that he had advised the victim one month before the incident to avoid sexual intercourse. We are not persuaded.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743

(1995). For example, "prejudice to the defendant could outweigh the probative value of evidence [inter alia] where the facts offered may unduly arouse the jury's emotions, hostility or sympathy . . . . [A] trial court has broad discretion in determining whether the probative value of proffered evidence is outweighed by the prejudice that is likely to result from its admission." (Citation omitted; internal quotation marks omitted.) Id., 307.

We recognize, as did the habeas court, that evidence of the victim's medical history was relevant to the state's theory that the victim did not have consensual sex with the petitioner. For example, the victim's preincident medical history was relevant because it provided context for Dr. Hakim's advice to the victim not to engage in sexual intercourse and bears on the issue of whether she may or may not have ignored such advice based on the severity of her condition. Indeed, as Attorney Hopkins admitted during the habeas trial, he argued during the petitioner's criminal trial that the victim may have ignored such advice. Furthermore, evidence of the victim's postincident surgery, given its temporal proximity to the incident, tends to support the victim's testimony that she was in "tremendous" and "[u]nbelievable" pain after the incident, which, in turn, tends to support the victim's testimony about not wanting to have sexual intercourse. We further recognize, as did the habeas court, that much of the evidence of the victim's postincident medical history also was relevant to the petitioner's defense that there were no signs of forced sexual intercourse and that her condition after the incident could be consistent with either forcible or consensual sexual intercourse.

The habeas court, however, failed to highlight any prejudicial effect that such evidence may have had on the petitioner's defense in light of any sympathy a jury

may have felt toward the victim.[4] Although we recognize this possible prejudicial effect, given the weight of the probative value of the evidence, we cannot conclude that trial counsel rendered deficient performance when he failed to object to any of this evidence. Furthermore, given the weight of the other evidence at trial,[5] we cannot conclude that if this evidence had been excluded there is a reasonable probability that the result of the proceeding would have been different.

## B

The petitioner next claims that the court erred by holding that he did not prove ineffective assistance of trial counsel on the basis of counsel's failure to object to alleged "expert" testimony of lay witnesses about forcible sexual intercourse, and the subsequent jury charge qualifying the physicians as experts, on the ground that such evidence was inadmissible because it pertained to an ultimate conclusion that was for the jury to decide. We disagree.

During the habeas trial, Attorney Hopkins testified that he was not sure whether Dr. Siegler and/or Dr. Hakim were qualified as experts. Attorney Hopkins further testified that he was not concerned about Dr. Siegler and Dr. Hakim being characterized as experts because their testimony was equivocal. Moreover,

---

[4] Evidence of prior gynecological problems and subsequent surgery and hormonal therapy could create sympathy toward the victim. But see Connecticut Criminal Jury Instructions § 2.10-3, available at http://www.jud.ct.go/JI/criminal/part2/2.10-3.htm (last visited September 13, 2013) ("[y]ou should not be influenced by any sympathy for the defendant, the defendant's family, the [complainant / decedent], the [complainant's / decedent's] family, or for any other person who might in any way be affected by your decision").

[5] This evidence includes, inter alia, the victim's testimony that the incident was not consensual, testimony that the victim was advised by Dr. Hakim not to engage in sexual intercourse, which the petitioner conceded was relevant, and testimony, discussed in part III of this opinion, that the petitioner admitted to sexual compulsion problems.

Attorney Hopkins testified generally that if he believed that he could have objected he would have objected.

The habeas court concurred with Attorney Hopkins' assessment and concluded that "[w]hether to object to their testimony was a tactical decision made in furtherance of the overarching trial strategy. The petitioner admitted having sexual intercourse with the victim, but claimed that it was consensual. According to both doctors, the victim's pain and worsening medical conditions could also have resulted from consensual intercourse with the petitioner. To object that the doctors were presenting expert testimony although only testifying as lay witnesses would contradict and undermine both the trial strategy and the tactical decision to use cross-examination to make this point. Consequently, the court is unable to conclude that Attorney Hopkins was deficient for failing to object on this ground" or that there was any resultant prejudice from his failure to object to the jury charge.

The petitioner argues that neither Dr. Siegler nor Dr. Hakim was qualified as an expert to render an opinion on forcible sexual intercourse and furthermore that, as the central credibility question for the jury to decide, such testimony was inadmissible because it pertained to an ultimate conclusion that was for the jury to decide. The petitioner contends that any claim that Hopkins did not object to such testimony as a tactical decision belies his trial strategy, which depended on crediting the petitioner and discrediting the victim. We are not persuaded.

"The court may properly admit expert testimony only from a witness it has first determined to be qualified to testify on a particular matter." *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 86, 828 A.2d 1260 (2003). "Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly

applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . An expert may, however, give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 35 Conn. App. 51, 69–70, 644 A.2d 923 (1994).

The petitioner relies primarily upon *State* v. *Apostle*, 8 Conn. App. 216, 512 A.2d 947 (1986). In *Apostle*, an emergency room physician who examined a victim of sexual assault shortly after the incident testified that, in his opinion, the intercourse between the defendant and the victim was nonconsensual. Id., 231. Such testimony was provided in light of the physician's physical examination of the victim, her mental state at the time of the examination and the history of the incident, which the victim gave to him. Id. This court concluded that "[t]he testimony of the doctor regarding whether the intercourse was consensual went beyond the scope of permissible expert testimony because it involved an opinion based upon factors outside the realm of his professional expertise. The doctor's opinion that the intercourse was nonconsensual was based in part upon the victim's emotional state as well as the victim's own representations given to him regarding the history of the incident. The doctor, therefore, reached a conclusion on the ultimate issue by drawing on factors already made known to the jury, and which went beyond his physical examination of the victim. Because such factors were previously presented before the jury, the jury was equally capable of reaching the conclusion sought from

the doctor. Determination of this issue requires no special knowledge or experience. The doctor's conclusion, therefore, was inadmissible." Id., 232.

The facts in *Apostle* are inapposite to the present case. The physician in *Apostle* rendered an opinion on whether he believed the sexual intercourse was consensual, and he relied on the victim's mental state and the history of the incident provided by the victim. In the present case, Dr. Siegler and Dr. Hakim rendered opinions on whether the victim's physical condition after the incident was *consistent* with forcible sexual intercourse. Furthermore, on cross-examination, Dr. Siegler and Dr. Hakim rendered equivocal opinions that the victim's physical condition after the incident was *consistent* with *both* forcible and consensual sexual intercourse. More importantly, these equivocal opinions were rendered exclusively as to the victim's physical condition.[6]

Although not at the disposal of either Attorney Hopkins or the court at the time of trial, *State* v. *Whitley*, 53 Conn. App. 414, 730 A.2d 1212 (1999), bears on the admissibility of such evidence. In *Whitley*, two physicians provided expert testimony to the effect that a finding of no physical injury was consistent with sexual assault. Id., 421. The court concluded that "the existence or absence of physical injury to a victim's genital or anal area and its relation to a sexual assault is not necessarily an obvious matter within the common knowledge of the average person. In addition, [the physicians'] expert testimony assisted the jury in intelligently assessing the ultimate issue of whether a sexual assault had occurred. Furthermore, a review of relevant portions of the transcript reveals that while [one physician] testified that physical injury would not necessarily

---

[6] This excludes Dr. Siegler's testimony about the truthfulness of the victim, which will be discussed in part II C of this opinion.

be found in a case of sexual abuse and [the other physician] responded affirmatively to the state's question of whether an absence of physical injury is consistent with sexual assault, they also testified that a lack of physical injury could indicate that an assault did not occur. We conclude, therefore, that the trial court did not abuse its discretion in allowing the state's experts to testify about the consistency of a lack of physical injury with assault." Id., 422.

The parties agree that neither Dr. Siegler nor Dr. Hakim was disclosed by the state as an expert witness. In any event, the testimony of Dr. Siegler and Dr. Hakim that the victim's pain was consistent with both forcible and consensual sexual intercourse is analogous to the testimony set forth in *Whitley*, which was deemed admissible. Although neither physician in the present case was disclosed as an "expert," because the testimony was equivocal, the failure to object falls within the realm of sound trial strategy, especially in light of the fact that the cumulative impact of the evidence may have been beneficial to the petitioner. Thus, Attorney Hopkins did not render ineffective assistance in failing to object to the "expert" testimony of Dr. Siegler or Dr. Hakim, or the subsequent jury charge describing them as experts, especially in light of the fact that he was able effectively to cross-examine them.

C

The petitioner finally claims that the court erred by holding that he did not prove ineffective assistance of trial counsel on the basis of counsel's failure to object to or move to strike testimony about the truthfulness of the victim on the ground that such evidence was inadmissible because it pertained to an ultimate conclusion that was for the jury to decide. We disagree.

During the habeas trial, Attorney Hopkins testified that he did not think that Dr. Siegler testified whether

the victim was reliable but that if Dr. Siegler had testified as such, such testimony would be inadmissible. Again, as previously set forth, Attorney Hopkins testified that if he believed that he could have objected he would have objected.

The habeas court noted that there was no question that Dr. Siegler testified on cross-examination and redirect examination as to his view of the victim's credibility, but that Attorney Hopkins did not elicit such testimony, which was nonresponsive to one of his questions. The habeas court further noted that Attorney Hopkins had a number of options to deal with Dr. Siegler's answer, such as moving to strike the answer as nonresponsive or, the option that he chose, further questioning Dr. Siegler in an effort to neutralize his opinion by showing that it was the product of speculation. The court concluded, based on the evidence presented, that Attorney Hopkins' approach to his cross-examination of Dr. Siegler was a reasonable strategy because, although the jury had the benefit of Dr. Siegler's view of the victim's credibility, it also heard that Dr. Siegler had little basis for that view. The court further concluded that, having opened the door on cross-examination, Attorney Hopkins could do little to limit the prosecutor's redirect examination on the same subject.

The petitioner argues that an expert may not testify regarding the credibility of a particular witness. In this regard, the petitioner contends that, as Attorney Hopkins could not testify to his tactical decisions, the habeas court's factual finding that he made a tactical decision to ask further questions of Dr. Siegler concerning his conclusion about the victim's credibility rather than moving to strike the testimony elicited on cross-examination and objecting to the prosecution's redirect examination is clearly erroneous. We disagree.

"The determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 36 Conn. App. 525, 530, 651 A.2d 1306 (1995).

Dr. Siegler's testimony with respect to the truthfulness of the victim was inadmissible. Nevertheless, the question remains as to whether Attorney Hopkins rendered deficient performance in not moving to strike this testimony. In *Toccaline* v. *Commissioner of Correction*, supra, 80 Conn. App. 800, a licensed clinical social worker testified on direct examination, without objection, that when he met with the minor victim, she described instances of sexual contact with her by the petitioner, then stated his belief that the victim had suffered sexual abuse by the petitioner and opined that the victim's testimony was truthful. "At the habeas trial . . . the petitioner's trial counsel, was called as a witness. He testified that although at the time of the trial he was not specifically aware of the rule that an expert witness may not testify that a victim is credible, he was aware, however, that the questioning in that regard was improper. He stated that as a general rule, he does not make many objections during trial and that when that testimony was given, he thought he might be able to use [the social worker's] statement of opinion on cross-examination to demonstrate that [the social worker] had reached his opinion rashly on the basis of just a brief interview of [the victim].

"At the habeas hearing, [an] attorney . . . testified as an expert witness on the petitioner's behalf that it

was below the standard of competence for [the petition-er's trial counsel] not to have objected to [the social worker's] testimony regarding [the victim's] veracity because it is well established in Connecticut that a constancy of accusation witness may not offer an opin-ion at trial as to a victim's veracity. The [habeas] court agreed." Id., 800–801. This court concluded that "[i]t appears from his cross-examination of [the social worker] that [the petitioner's trial counsel] was attempting to discredit [the social worker's] opinion by showing that he had met [the victim] only one time. . . . In apparent acceptance, however, of a wooden proposition that competent counsel must always object to objectionable opinion testimony by an expert, the court accorded no deference to the exercise of discre-tion and use of tactics by trial counsel. In determining that [the petitioner's trial counsel] was ineffective for not objecting to [the social worker's] testimony merely because the testimony was, in fact, objectionable, the court ignored our jurisprudence that mandates defer-ence to the tactics of trial counsel." (Footnotes omit-ted.) Id., 801–802.

As in *Toccaline*, in the present case, Attorney Hopkins did not object to the evidence on reliability. Unlike the situation in *Toccaline*, however, Attorney Hopkins never testified before the habeas court that this was a trial tactic. Nevertheless, Attorney Hopkins did not elicit this testimony, which was put before the jury without his opportunity to object. As the habeas court noted, there were limited options for Attorney Hopkins once the testimony was given. The transcript itself serves as evidence of Attorney Hopkins' pursuit of cross-examination as a trial tactic, and the habeas court's conclusion of such is not clearly erroneous. Ultimately, in light of the fact that Attorney Hopkins did not elicit the testimony, we agree with the habeas court that he did not render deficient performance in

not moving to strike such testimony but in choosing, instead, to further question Dr. Siegler in an effort to neutralize his opinion by showing that it was the product of speculation.

Even so, the question remains as to whether Attorney Hopkins rendered deficient performance in not objecting to this testimony on redirect examination. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Internal quotation marks omitted.) *State* v. *Pulley*, 46 Conn. App. 414, 421–22, 699 A.2d 1042 (1997).

In any event, in light of Attorney Hopkins' trial tactic, as found by the habeas court, to further question Dr. Siegler in an effort to neutralize his opinion by showing that it was the product of speculation, it would be incongruous to object on redirect examination as to the same subject matter. Thus, we conclude that Attorney Hopkins also did not render deficient performance in not objecting to this testimony on redirect examination.

### III

The petitioner also claims that the court erred by holding that he did not prove ineffective assistance of trial counsel on the basis of counsel's failure to request a jury instruction on alleged prior misconduct evidence

and choosing, instead, to argue the irrelevancy of such evidence in closing argument. We disagree.

The following additional facts, previously set forth by this court on direct appeal, are necessary for our resolution of this claim. "On the day following the sexual assault, the [petitioner] went to the Naugatuck police station and voluntarily provided a written statement concerning the incident. The police had not summoned or requested that the [petitioner] come to the station, nor had they questioned him regarding the incident or the victim's complaint. The [petitioner] testified that he went to the police station after his wife informed him that the victim had telephoned and made accusations that she had been sexually assaulted by the [petitioner]. . . .

"Harrison, a detective with the Naugatuck police department, testified that when asked why he came to the police station, the [petitioner] provided the same explanation to her. Harrison further testified that upon arrival at the station, the [petitioner] was observed to be 'extremely upset, extremely nervous,' and spent approximately two hours writing his statement and that 'it seemed like he struggled to go through it.' In addition, Harrison testified as to oral statements made by the [petitioner] while he was at the police station, in which he admitted having sexual compulsion problems. Specifically, Harrison testified that the [petitioner] stated that he 'has a real problem with sex . . . needs to have it all the time and can't help himself or control himself.' Harrison also testified that the [petitioner] told her that he was experiencing marital problems as a result of his sexual compulsions and infidelity.

"The trial court admitted the testimony concerning the [petitioner's] statements regarding his sexual compulsions pursuant to the party admission exception to the hearsay rule. The [petitioner] objected on the

grounds that the testimony was irrelevant and 'more highly prejudicial than probative under the circumstances.' The [trial] court found that the testimony's probative value outweighed the prejudice." *State* v. *White*, supra, 55 Conn. App. 421–22.

During his closing, Attorney Hopkins argued, inter alia: "[T]he fact that [the petitioner] admits to having been unfaithful, what does that have to do with an allegation of sexual assault? Nothing. That he has some sort of sexual compulsion, admittedly, meaning that he likes sex, that he's had sex with other women than his wife, that essentially he's probably no different than most other men except for the fact that he's acted on these and cheated on his wife. He's admitted that, but again, what does it have to do with the allegation of sexual assault? From an evidentiary point of view, nothing."

On direct appeal, the petitioner claimed that the trial court improperly admitted under the admissions exception to the hearsay rule statements he made to Harrison regarding a sexual compulsion problem. *State* v. *White*, supra, 55 Conn. App. 421. This court noted that "[t]he [petitioner's] statements concerning his sexual compulsion and self-control problems clearly were relevant, material and highly probative on the issue of whether he compelled the victim to engage in sexual intercourse" and concluded, ultimately, "that the trial court did not abuse its broad discretion concerning evidentiary matters by admitting into evidence the [petitioner's] statements as an admission of a party opponent." Id., 423. During the habeas trial, Attorney Hopkins testified that after this evidence was admitted, he did not request any type of limiting instruction.

The habeas court concluded that Attorney Hopkins' arguments and purported failure to request a charge

on this alleged prior misconduct evidence are not indicative of deficient performance. The court stated: "The evidence clearly was relevant to the charges and the defense asserted by the petitioner that the sexual acts between him and the complainant victim were voluntary and consensual. Thus, having failed to prove both deficient performance and the required showing of prejudice stemming therefrom, this claim must be denied."

The petitioner argues that such evidence constitutes prior misconduct evidence and was inadmissible to prove his bad character or criminal tendencies. In this regard, the petitioner contends that Attorney Hopkins should have sought a limiting instruction. We are not persuaded.

At the outset, we are unaware of any authority where general statements concerning "sexual compulsion" constitute evidence of "prior *misconduct.*" Indeed, on direct appeal, this court considered the admissibility of this evidence under an exception to the hearsay rule. *State* v. *White,* supra, 55 Conn. App. 421–23. In any event, we are limited to a consideration of the petitioner's claim concerning the propriety of Hopkins' failure to request a limiting instruction. Ultimately, given that the state expressly sought to admit this evidence as to the issue of *consent and force,* and the court admitted it for such purpose, a limiting instruction that such evidence shall not be used for the bad character or criminal tendencies of the petitioner would have been of little value. Thus, Attorney Hopkins did not render deficient performance by choosing to argue during closing the irrelevancy of such evidence rather than choosing to request a limiting instruction.

IV

The petitioner further claims that the court erred by holding that he did not prove ineffective assistance of trial counsel on the basis of counsel's failure to object

to the state's closing argument on the ground of prosecutorial impropriety. We disagree.

The following additional facts are necessary for our resolution of this claim. During her closing, the prosecutor argued, inter alia: "There was a moment in this trial that struck me, and I think it will stay with me for some time . . . and it was during [the victim's] testimony . . . it was just a few rather impassioned words that kind of burst forth from her . . . heart. And the reason they struck me was because in that one moment in those few words I think she summed up for us what all of us as a group, a society, the way that we look at crime and the way that we deal with it in our everyday lives. . . . Everyday, I would submit to you that we disassociate ourselves from it. We have our little wall, our protected zone that's up, and we say, oh, well, that crime, that happened over there. That happened in the eastern side of the state over our wall. That's somebody else, that's not me. And what [the victim] did in this case was, she came in here, she took that stand and she told you this was suppose[d] to happen to somebody else. This wasn't suppose[d] to happen to me. And, ladies and gentlemen, I would submit that [the victim] has the same thinking about crime as we all do as regular members of society. It's not suppose[d] to happen to her, according to her thoughts. It's not suppose[d] to happen to you. It's not suppose[d] to happen to me, or to her, or to him. It's always somewhere else. It's always somebody else. And, unfortunately, in this case, if you believe [the victim's] testimony, she is the somebody else. . . .

"I would ask you when you reflect on [the victim's] testimony, use your imagination, your own experiences. Think back to your last sexual encounter . . . . Now, imagine you are going to come up here and testify about it and give us the explicit details. How comfortable

would you be under those circumstances? And remember, it's a room full of strangers you would be talking to. [The victim] doesn't know us. She hadn't met you prior to this time, and yet she's expected to come in here and tell you explicit details of what you've heard. Now, imagine also, if you take your last sexual encounter and you don't get to testify about it today. Let's say you know you are going to testify about it down the road, and let's say it's fifteen months down the road. You know it's coming. I assume it's something you would be dreading, and it's building and building month by month, week by week, and day by day. And finally the day comes and you've got to go through with it. How anxious would you be on that day? How comfortable would you be? I would submit to you, ladies and gentlemen, that is a little piece of [the victim's] experience in this courtroom."

The prosecutor then asked the jury why the petitioner would undergo the postincident examination and risk her closest relationship with her best friend and alienate her best friend's family in order to make a false accusation. The prosecutor continued: "I would submit to you, ladies and gentlemen, because [the victim's] recollection is what happened.

\* \* \*

"Her actions, I would submit to you, sound like a woman who's been traumatized by the events and not by someone out to get the [petitioner] at any costs. I submit to you that she was still putting other people ahead of her, even the family . . . of the man she claims raped her. Remember her words, ladies and gentlemen? This was suppose[d] to happen to somebody else and not to me. I would submit to you, ladies and gentlemen, who else but a woman who had experienced that trauma, who had been in that denial as Dr. Hakim had told you, would even entertain the thought that

this should have happened to somebody else and not to her if she were out to get this man."

After Attorney Hopkins' closing argument, the prosecutor argued on rebuttal, inter alia: "I would submit to you that I think the [petitioner's] description of the sexual encounter presented to you was . . . contrived. . . . I would submit to you, why is it that [the petitioner] was so eager, so enthusiastic to get down to that station and give his statement? This was a man with four felony convictions. What makes him so anxious under the circumstance to come in contact with the police? Remember, ladies and gentlemen, if indeed [the victim's] claim was false, wouldn't it be natural to wait to see if she really had the nerve to go down to the police if they really were going to take her seriously? He doesn't know what she said. Apparently, this was all fabricated. If he doesn't know what she said, he doesn't know how much sense it made. Why should he have automatically assumed the police are going to believe her? I submit to you, ladies and gentlemen, he ran down there because he knew what he had done. He had nothing to lose. He knew what had happened. He knew if she went to the police she was telling what had happened, and he knew that this was his only chance to create some type of version of his story to cast stones at [the victim], as what she had said, as who she was, at her complaint."

The habeas court addressed this claim in terms of prosecutorial impropriety. The court concluded that, even if it were to discuss this claim in the context of ineffective assistance of counsel, there was no prosecutorial impropriety to object to in the prosecutor's closing argument. The court further noted that, even if a basis existed for objection, there was nothing so egregious that required an objection from Attorney Hopkins.

The petitioner argues that Attorney Hopkins rendered ineffective assistance because he failed to object when

the prosecutor improperly argued that the victim and other witnesses were truthful, offered her opinion about the evidence and appealed to the jury's emotions. We are not persuaded.

"In determining whether counsel's failure to object to the prosecutor's remarks was unreasonable, we must first ascertain whether the prosecutor's remarks were, in fact, improper. To make such a determination, we do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the remarks in question must be shown to have been so prejudicial that the entire proceedings were tainted."[7] (Citation omitted; internal quotation marks omitted.) *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 398, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999).

"While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . It is well settled that a prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Nor may he express his opinion, directly or indirectly, as to the guilt of the defendant.

---

[7] Ultimately, the alleged prosecutorial impropriety must rise to the level of a due process violation. In determining whether the impropriety was so serious as to amount to a denial of due process, our Supreme Court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), focused on several factors, including "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

. . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions. . . .

"It does not follow from this, however, that every use of rhetorical language is improper. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence presented at trial. . . .

"The mere use of phrases such as 'I submit,' 'I find,' or 'I believe' does not constitute improper argument. . . . While a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Citations omitted; internal quotation marks omitted.) Id., 398–401. "In addition, jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper

for counsel to appeal to a jury's common sense in clos-
ing remarks." (Internal quotation marks omitted.) *State*
v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006).

Regardless of any alleged prosecutorial impropriety,
given trial counsel's wide discretion to object, Attorney
Hopkins did not render deficient performance by not
objecting to the prosecutor's closing argument.

V

Finally, the petitioner claims that the court erred by
holding that he did not prove ineffective assistance of
trial counsel on the basis of counsel's alleged failure
to present evidence and advise the petitioner during
sentencing. We disagree.

The following additional facts are necessary for our
resolution of this claim. The presentence investigation
report included a letter from the petitioner in which he
maintained his innocence, accused the victim of lying
and referenced the ineffectiveness of his trial counsel.
The report also set forth the petitioner's criminal history
and included statements from the petitioner and his
mother concerning prior psychiatric treatment, pre-
scriptions and depression. During sentencing, Attorney
Hopkins argued a number of mitigating factors, includ-
ing the lack of physical injuries to the victim along with
the petitioner's employment, and his family history with
his wife and child. Attorney Hopkins further attempted
to mitigate the effect of the petitioner's criminal history.
Moreover, the petitioner's sister, wife and mother pre-
sented statements on his behalf. The petitioner then
exercised his right of allocution in which he again main-
tained his innocence, accused the victim of lying and
claimed that Attorney Hopkins rendered ineffective
assistance of counsel. The court noted: "[T]his is one
of the rarest lack of remorse that this court has ever

seen in anyone." The court then referenced the petitioner's "violent criminal record" and sentenced the petitioner.

During the habeas trial, Attorney Hopkins testified that he did not recall meeting with the petitioner after the jury returned its verdict but before the petitioner's presentence interview, did not recall attending the presentence interview, did not recall discussing sentence mitigation with the petitioner and did not recall discussing the release of the petitioner's medical records. Attorney Hopkins further testified that he would have reviewed the presentence investigation report with the petitioner sometime prior to sentencing and believed that he had advised the petitioner with respect to his right of allocution. In particular, Attorney Hopkins testified: "I'm sure I told [the petitioner] prior to his allocution that he ought to be as reserved as possible and as respectful as possible to the court and the victim and everybody else concerned. But beyond that, I only have so much control." Attorney Hopkins further testified that the presentence investigation report made reference to prior psychiatric treatment but nothing that amounted to a defense or mitigation.

The petitioner testified that Attorney Hopkins did not attend his presentence interview, meet with him at any time after the jury returned its verdict but before the presentence interview, discuss sentence mitigation or discuss the release of the petitioner's medical records. The petitioner testified, however, that he had told Attorney Hopkins that he had been in the hospital a couple of times and was taking medication. The petitioner further testified that Attorney Hopkins did not meet with him to discuss his presentence investigation report, provide a copy of it to him or provide any advice on allocution. The petitioner testified that if he had been provided advice he would not have made allegations against others or been so outspoken at the presentence interview

and the sentencing itself. The petitioner then testified about his prior psychiatric treatment, prescriptions and depression.

The habeas court referenced Attorney Hopkins' testimony, which indicated that the petitioner's depression was not mitigating, and noted that "[o]ther than this scant testimony, there has been no evidence presented in support of [this claim] of deficient performance, let alone the resultant prejudice." The court then found this claim completely unsupported, without merit or abandoned.

The petitioner argues that this claim is not unsupported, without merit or abandoned because trial counsel admitted before the habeas court that he did not meet with the petitioner after the jury returned its verdict but before the petitioner's presentence interview, that he did not attend the presentence interview, that he did not discuss sentence mitigation with the petitioner and that he did not discuss the release of the petitioner's medical records. The petitioner further indicates that he testified before the habeas court that if he had been properly advised about allocution, he would not have lashed out and angered the court. Thus, the petitioner argues that there is a reasonable probability that he would have received a lesser sentence if the sentencing court had learned about his prior psychiatric treatment, prescriptions and depression and if he had not lashed out and angered the court. We are not persuaded.

We recognize that claims for ineffective assistance of counsel include assistance during sentencing. See *Copas* v. *Warden*, 30 Conn. App. 677, 684–86, 621 A.2d 1378 (1993), on appeal after remand, 234 Conn. 139, 662 A.2d 718 (1995). Ultimately, irrespective of whether the performance prong of the *Strickland* test was satisfied, the petitioner has not met the prejudice prong.

Although medical records were not provided, there was evidence of the petitioner's prior psychiatric treatment, prescriptions and depression in the presentence investigation report. In any event, the habeas court credited the testimony of Attorney Hopkins that this evidence would not have been mitigating for the sentencing court. Furthermore, the presentence investigation report recommended a lengthy period of incarceration in light of the petitioner's criminal record, the "extremely violent" nature of the offense at issue, and the "great emotional and physical pain" experienced by the victim. Although the sentencing court, *Espinosa, J.*, referenced the petitioner's "lack of remorse" during sentencing, the court extensively referenced the petitioner's "violent criminal record" before setting forth the sentence. We conclude that there is no reasonable probability that the result of the proceedings would have been different. Accordingly, we conclude that the habeas court did not err by holding that the petitioner did not show ineffective assistance of counsel with respect to any of his claims.

The judgment is affirmed.

In this opinion the other judges concurred.