******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## APPENDIX
## IN RE NOAH R.-R.*

Superior Court, Judicial District of Hartford, Juvenile Matters
File No. CP-21-019080-A

Memorandum filed December 19, 2024

*Proceedings*

Memorandum of decision on petitioner's motion to terminate respondent father's parental rights with respect to his minor child. *Petition granted.*

*Chelsea Ruzzo*, assistant attorney general, for the petitioner.

*Joshua D. Michtom*, assigned counsel, for the respondent father.

*Micoya G. Hutchins*, assigned counsel, for the minor child.

*Opinion*

HON. STEPHEN F. FRAZZINI, JUDGE TRIAL REFEREE.

## MEMORANDUM OF DECISION

On March 7, 2023, the Commissioner of Children and Families (commissioner) filed a petition in this court to terminate the parental rights of [the respondents] Madelei R. and Jorge R.-M. to the minor child [Noah].[1] Trial of a TPR petition brought by the commissioner in this court for a child in the [Department of Children and Families'] custody is governed by General Statutes

---

* Affirmed. *In re Noah R.-R.*, 233 Conn. App. 522,     A.3d     (2025).

Pursuant to General Statutes § 46b-142 (b) and Practice Book §§ 32-7 (a) and 79a-12, the names of the parents and child in this matter will not be disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein, and upon order of the court.

[1] For brevity's sake, the court will sometimes refer to the petition for termination of parental rights as a "TPR" petition.

§ 17a-112.[2] As grounds for termination, the petition alleged failure to rehabilitate after an adjudication of neglect and acts of omission or commission against both respondents pursuant to subsections (j) (3) (B) (i) and (C) of [§ 17a-112].

Neither respondent was present for the initial hearing in the Superior Court on the termination petition and they were both defaulted that day for not appearing,

---

[2] General Statutes § 17a-112 provides in relevant part: "(a) In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child. . . . (i) The Superior Court . . . may grant a petition for termination of parental rights based on consent filed pursuant to this section if it finds that (1) upon clear and convincing evidence, the termination is in the best interest of the child, and (2) such parent has voluntarily and knowingly consented to termination of the parent's parental rights with respect to such child. . . . (j) The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b . . . that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; [or] (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . . "

but the court subsequently vacated those defaults when the respondents did appear on May 9, 2023. That day, both respondents were advised of their rights and entered denials to the allegations of the petition. In due course the case was assigned for trial before this judge on May 7, 2024. On that date the commissioner withdrew the petition as to the respondent Madelei R. Trial on the TPR petition against Mr. R.-M. was continued one week, until May 14, 2024.

On that later date, Mr. R.-M. submitted a plea of nolo contendere to the adjudicatory allegations contained in the termination petition. More specifically, he pleaded nolo contendere to the following allegations in the petition:

• That the Department of Children and Families (DCF or department) made reasonable efforts to locate him and to reunify Noah with him;

• That Mr. R.-M. had been unwilling or unable to benefit from reunification efforts;

• That DCF did not need to prove reasonable efforts to reunify because the Superior Court for Juvenile Matters had previously approved a permanency plan for Noah other than reunification;

• That Noah had previously been found neglected, and after being provided specific steps Mr. R.-M. failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a [responsible] position in Noah's life; and

• That Noah had been denied, by reason of an act or acts of parental commission or omission, including but not limited to . . . severe physical abuse or a pattern of abuse . . . the care, guidance or control necessary for [his] physical, educational, moral or emotional well-being.

After canvassing Mr. R.-M. thoroughly on his plea, this court found that he had waived his right to trial on adjudicatory issues and accepted his plea but reserved making formal findings until issuance of its final decision. The court then proceeded to evidence on the child's best interest. The commissioner presented testimony from DCF social worker Krista Westerman, and the father also testified. In addition, the commissioner introduced the following exhibits into evidence without objection:

- Affidavit of DCF Social Worker Berta Ramos, dated October 29, 2021 (exhibit (ex.) A);

- Neglect Social Study dated January 18, 2022 (ex. B);

- Study in Support of Permanency Plan dated July 7, 2022 (ex. C);

- Social Study in Support of Petition for Termination of Parental Rights dated March 6, 2023 (ex. D);

- Study in Support of Permanency Plan dated August 8, 2023 (ex. E);

- Addendum to Social Study in Support of Petition for Termination of Parental Rights dated December 12, 2023 (ex. F);

- Addendum to Social Study in Support of Petition for Termination of Parental Rights dated March 26, 2024 (ex. G);

- Respondent father's Specific Steps (ex. H);

- Psychological Consultation conducted by Dr. Inés Schroeder, Psy.D., dated September 21, 2023 (ex. I);

- Respondent father's Certified Conviction Criminal History dated April 11, 2024 (ex. J);

- East Hartford Police Department Case/Incident Report of Officer Brian Altamirano signed on November

28, 2021, and two Supplementary Case/Incident Reports of Officer Briahna Martin signed on November 29, 2021, and April 26, 2022; (ex. K); and

- Affidavit of Dr. Nina Livingston, employed at the Connecticut Children's Specialty Group at Connecticut Children's Medical Center (CCMC), dated October 27, 2021 (ex. L).

Following the conclusion of evidence, the parties submitted written briefs. Upon review of those briefs, it became apparent that the parties were operating under different factual assumptions. The commissioner's brief made clear that the department was assuming that the respondent father's guilty plea and conviction on risk of injury charges related to Noah's injuries were components of the petitioner's proof that he had caused the many injuries inflicted on Noah. See, e.g., Petitioner's trial brief, p. 2 (The respondent "failed to take accountability for and demonstrate insight as to the injuries he inflicted upon Noah . . . . His repeated refusal to take accountability for Noah's injuries, even while he sits in prison for this crime, is a serious child protection concern for the department."); id., p. 14 ("[e]qually, if not more, concerning is the fact the respondent-father refuses to take accountability for the injuries he inflicted upon Noah"). The respondent father's trial brief, on the other hand, asserted that the guilty plea he entered into criminal court on the risk of injury charges based on Noah's injuries was pursuant to the so-called *Alford* doctrine that permits a criminal defendant to plead guilty without admitting actual guilt.[3]

---

[3] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). "The *Alford* doctrine allows a defendant to plead guilty without admitting guilt. In pleading guilty, however, the defendant acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea." (Internal quotation marks omitted.) *State* v. *Boscarino*, 86 Conn. App. 447, 451 n.4, 861 A.2d 579 (2004). "United States Supreme Court cases have described *Alford* pleas as permitting a defendant to plead guilty while protesting innocence. See, e.g., *United States* v. *Vonn*, 535 U.S. 55, 69 n.8, 122 S. Ct. 1043, 152 L. Ed. 2d 90 (2002); *Henderson* v.

There was no evidence offered at trial, however, that the defendant had entered his guilty plea under the *Alford* doctrine. The respondent's brief was the first reference of which the court is aware of his guilty plea having been entered under that doctrine. The court thus ordered supplemental briefing, which the court considered necessary for a well reasoned decision.[4] The court also inquired of the parties whether they sought the court to take judicial notice of the criminal proceeding. Since then, the court has also received a transcript of the trial. The last brief has now been filed, and the court has taken judicial notice of the defendant's *Alford* plea and conviction in the criminal proceeding. Since neither of the parents claimed Native American ancestry, the federal and state Indian Child Welfare Acts do not apply here. The court is not aware of proceedings pending in any other court regarding the custody of this child and has jurisdiction. The matter is now ready for decision.

In considering the evidence, the court must assess the credibility and weight of the evidence presented and may also consider judicially noticed facts. The trial court is not required to accept as true the testimony of any witness, the contents of exhibits, or the information contained in judicially noticed facts. "The sifting and weighing of evidence is peculiarly the function of the trier [of fact]. . . . The trier is free to accept or reject,

*Morgan*, 426 U.S. 637, 648 n.1, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976) (White, Stewart, Blackmun *and* Powell, Js., concurring)." *White* v. *Warden*, Docket No. CV-00-0598782-S, 2011 WL 4347030, *5 n.17 (Conn. Super. August 17, 2011) (*Bright, J.*), aff'd, 145 Conn. App. 834, 77 A.3d 832, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013).

[4] See *Cowles* v. *Cowles*, 71 Conn. App. 24, 26, 799 A.2d 1119 (2002) (holding that 120 day time limit set forth in General Statutes § 51-183b for rendering of opinion after trial of cause "begins to run from the date that the parties file posttrial briefs or other material that the court finds necessary for a well reasoned decision"); see also *Frank* v. *Streeter*, 192 Conn. 601, 604–605, 472 A.2d 1281 (1984) (same); *Bramwell* v. *Dept. of Correction*, 82 Conn. App. 483, 488, 844 A.2d 957 (2004) (same).

in whole or in part, the testimony offered by either party. . . . That determination of credibility is a function of the trial court." (Citations omitted; internal quotation marks omitted.) *Heritage Square, LLC* v. *Eoanou*, 61 Conn. App. 329, 333, 764 A.2d 199 (2001).

The court has carefully considered the petition and the totality of the evidence, assessed the credibility of the two witnesses who testified and the exhibits introduced into evidence, and considered the information and materials judicially noticed according to the standards required by law. The testimony of social worker Westerman is found to be consistent with the information contained in the exhibits or judicially noticed, and that testimony and the contents of the exhibits are found to be consistent and credible. The father's testimony focused on his explanation of why he had pleaded guilty and his hope "to be a resource" for his son in the future. See trial transcript, p. 71–72. Upon such consideration, and for the reasons described below, the court finds that the following facts were proven at trial by clear and convincing evidence.

# I
## LEGAL STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

Under subsections (j) (1) and (3) of [§ 17a-112], in a contested proceeding the commissioner must prove by clear and convincing evidence both a statutory ground for termination of parental rights and that the department made reasonable efforts to locate the parent and reunify the child with the parent unless the court finds that the parent was unable or unwilling to benefit from reunification efforts or another statutory exception. That portion of the trial is referred to as the adjudicatory phase of the proceeding. See *In re Michael R.*, 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn.

919, 722 A.2d 807 (1998); *In re William R. III*, 65 Conn. App. 538, 546, 782 A.2d 1262 (2001).

Subsection (j) (2) of [§ 17a-112] then requires clear and convincing evidence that termination is in the child's best interest. "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether clear and convincing evidence has proven that termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a contested TPR proceeding, the court is required to make and consider findings regarding seven factors specified in § 17a-112 (k). See, e.g., *In re Tabitha P.*, 39 Conn. App. 353, 362, 664 A.2d 1168 (1995).

## II
## FACTS

Noah was born on August 18, 2021. For the first two months of his life, he lived in East Hartford, Connecticut, with his mother and father, the respondents named in the termination petition. On October 25, 2021, his parents took him to their pediatrician's office, where they reported swelling on his upper left thigh. An x-ray there showed a fracture to his left femur. Both parents told the doctor that they did not know the cause of the injury but said that the father had been caring for the child for the last two days while the mother worked. The child was then taken by ambulance to [CCMC]. After x-rays and physical examination of the child there, doctors found bruising to the left side of jaw and neck and twenty-one fractures in various stages of healing. The fractures were to Noah's collar bone, ribs, upper arm, forearms, one hand, fingers, thigh, lower legs, and feet. Many of the injuries were more than ten days old, others more than two weeks old, some between two

and four weeks old, and one at least four weeks old. X-rays of the left thigh showed a "comminuted fracture," which the CCMC [Suspected Child Abuse and Neglect Program] (SCAN) reported meant an "upper thigh break with multiple pieces." Ex. L, p. 12.

The doctor's office, the Manchester Police Department, and an EMT from the Manchester Fire Department all made reports to DCF's Careline about Noah's injuries, and the department assigned investigators to assess the situation. East Hartford police officers also began an investigation. The evidence contains information about what the parents have said about the events that led them to take Noah to the pediatrician on October 25, 2021. These include statements they both made to the DCF investigating social worker on October 26, what the father told Dr. Tokumi at CCMC and both parents said to Dr. Livingston there on October 26, what the parents said to East Hartford Police Officer Altamirano in the late evening hours of October 25, or early morning hours of October 26, what they later said to East Hartford Police Officer Martin on October 26, and what the mother told Officer Martin on February 21, 2022. Neither the parents nor any of the relatives who sometimes cared for Noah have provided any explanation for the injuries, except that Mr. R.-M. said that earlier that evening he had dropped Noah while bathing him in the sink, and both parents reported a minor motor vehicle accident two weeks earlier during which Noah had been in his car seat. Doctors have discounted either of those incidents as the likely causes of the many injuries to Noah.

When asked about the day in question, both parents said that the mother had worked from 4 a.m. to 2 p.m., and the father had cared for the child in her absence. (He later told police that "he works for a landscaping company and due to the weather they were not working" that day. Ex. K, p. K-6.) The father had put the

child in a car seat, picked the mother up from work, and they all returned home. Both parents told DCF that the father had been worried about Noah being constipated and had called the pediatrician's office that day for advice. The father left the home for a while and while out received a call back from the pediatrician, and he later told police that, "when he returned home, he began doing what the doctor recommended. Jorge stated that he gave [Noah] 2 ounces of water, rubbed his stomach, and performed bicycle motions with [Noah]'s legs, then gave him a bath in the kitchen sink. Jorge stated that [Noah] seemed to be uncomfortable when he was performing the bicycle/pedaling motions but was not crying. Jorge stated that after the bath he put [Noah] to sleep and everyone in the house fell asleep. Jorge stated that he was awaken by [Noah] crying. Jorge stated that he went to change [Noah's] diaper to see if the doctor's recommendations had worked. Jorge stated when he was changing [Noah's] [diaper] he noticed his leg was swollen. Jorge stated that [Noah's] leg did not look like that when he had bathed him hours before. Jorge stated that he showed Madelei and they decided to take him to the hospital." Ex. K, p. 6. (The father said something slightly different to DCF: "Father stated that he put his baby in the sink like the doctor's office advised, placed a towel around the sink as a cushion and he gave him a bath and then moved his legs like a bicycle." Ex. A, p. 5.) CCMC confirmed that the advice given by the primary care physician had been "bicycling legs, warm cloth on bottom, use thermometer, one ounce of water." Ex. L, p. 3.

Dr. Nina Livingston, from the CCMC SCAN program, told DCF that "normal handling" of an infant would not have caused these fractures, and that pain responses such as crying and/or screaming would have been expected from Noah after these various injuries. The

doctors told DCF that the injuries were "highly suspicious for inflicted injury." Ex. A, p. 9. The fracture to the left femur "would have required bending force." Ex. K, p. 13. Dr. Livingston later told the police that Noah had sustained no new bone fractures while at CCMC, thereby "showing that day to day handling" would not have caused the ones detected at CCMC and negating underlying "bone fragility issues" as their cause. Id.

The department decided to seek an order of temporary custody (OTC) and file a petition under General Statutes § 46b-129 alleging that the child was neglected, by being denied proper care and attention and living under conditions injurious to his well-being, and abused by having physical injuries inflicted by other than accidental means and that were at variance with the history given of them. The OTC was granted and the petition filed on October 29, 2021.

Both parents appeared with counsel at the preliminary hearing on the OTC held on November 5, 2021. They were advised of their rights, entered pro forma denials to the allegations of the petition, but agreed for the OTC to be sustained. On July 20, 2022, both parents entered nolo contendere pleas to the two allegations of neglect, and Noah was adjudicated to have been neglected and committed to the commissioner. On March 7, 2023, the commissioner then filed the pending TPR petition.

On June 3, 2022, Mr. R.-M. was arrested by East Hartford police on charges of assault in the second degree and risk of injury to a minor in connection with the injuries inflicted on Noah. On November 29, 2023, he entered a guilty plea under the *Alford* doctrine and was convicted of the risk of injury charge, for which he received a sentence of three years [of] incarceration, suspended after eighteen months, with three years [of] probation.

# III
# ADJUDICATION

Mr. R.-M. having entered a plea of nolo contendere to the adjudicatory allegations, Practice Book § 35a-1 (b) provides guidance on how the court should proceed. That section provides in relevant part as follows: "An admission to allegations or a plea of nolo contendere may be accepted by the judicial authority. Before accepting an admission or plea of nolo contendere, the judicial authority shall determine whether the right to trial has been waived, and that the parties understand the content and consequences of their admission or plea. If the allegations are admitted or the plea accepted, the judicial authority shall make its adjudicatory finding as to the validity of the facts alleged in the petition and may proceed to a dispositional hearing. . . ." Practice Book § 35a-1 (b). The court has reviewed the allegations in the petition and considered the evidence provided in the exhibits and through the testimony of social worker Westerman and the respondent father. The information contained in the exhibits is found to be consistent with the testimony of social worker Westerman, and her testimony and the contents of the exhibits are found credible and proven to be true. The following facts alleged in the petition, including those set forth in the summary of facts and incorporated into the petition, are found to state a sufficient and valid factual basis for the adjudicatory allegations contained in the petition, and, by virtue of the evidence presented at trial, were also proven by clear and convincing evidence:[5]

---

[5] The meaning of the requirement contained in Practice Book § 35a-1 (b) that the court should "make its adjudicatory finding *as to the validity of the facts alleged* in the petition" (emphasis added) is not clear. In criminal cases in this state, "a factual basis is not required to be established to accept a nolo contendere plea." *State* v. *Godek*, 182 Conn. 353, 364, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981). That same case states, however, that a court may nonetheless "in [its] discretion . . . [insist] upon the establishment of a factual basis before accepting a nolo plea." Id., 365 n.13. In accepting the father's plea of nolo contendere here, this court stated as follows:

• That [DCF] made reasonable efforts to locate Mr. R.-M. and to reunify Noah with him;

• That Mr. R.-M. was unwilling or unable to benefit from reunification efforts;

• That DCF did not need to prove reasonable efforts to reunify because the Superior Court for Juvenile Matters previously approved, on October 25, 2022, a permanency plan for Noah other than reunification;

• That pursuant to § 17a-112 (j) (3) (B) (i) Noah had previously been found neglected on July 20, 2022, and after being provided specific steps Mr. R.-M. failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a [responsible] position in Noah's life; and

• That pursuant to § 17a-112 (j) (3) (C) Noah had been denied, by reason of an act or acts of parental commission or omission, including but not limited to severe physical abuse or a pattern of abuse, the care, guidance or control necessary for [his] physical, educational, moral or emotional well-being.

# IV
## DISPOSITION

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." (Internal quotation marks omitted.) *In re*

---

"Upon a review of the allegations contained in the petition and in the Summary of Facts, the court finds that they say that sufficient and valid basis for the findings so alleged. And the court will accept the plea. And the court will find that—actually, I'll reserve the findings—specific findings until my written decision." Trial transcript, p. 16. In so stating, the court reserved its right to find a factual basis for the respondent's plea. Moreover, such findings, even if unnecessary for making an adjudicatory determination or accepting the respondent's plea, are also pertinent to the court's dispositional findings in this case.

*Davonta V.*, 98 Conn. App. 42, 46, 907 A.2d 126 (2006), aff'd, 285 Conn. 483, 940 A.2d 733 (2008). In finding during the dispositional phase that it is in Noah's best interest for the parental rights of his father to be terminated, the court has considered the evidence and testimony related to circumstances and events up to and including the date upon which the evidence in this matter was concluded.

**A**
**Statutory Termination Factors**

In making the dispositional decision regarding whether to terminate a respondent's parental rights to this child in a contested termination proceeding, § 17a-112 (k) requires the court to consider and make written findings regarding seven factors specified in that statute. "The . . . factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003).

**1. "The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent"—§ 17a-112 (k) (1).**

DCF offered timely and appropriate services to the respondent to facilitate reunion with Noah. These included referrals for individual counseling, supervised visitations through the Quality Parenting Center [QPC] at the Village, fatherhood engagement services at the Village, and, after a six month hiatus in visitation because of a protective order entered after he was arrested, DCF supervised visits. After the mother disclosed intimate partner violence with Mr. R.-M., the department referred him for domestic violence services

at the Radiance program and later at [Community Health Resource's (CHR)] [Intimate Partner Violence (IPV)] Fair program. The department also asked the court to order a psychological evaluation, with one of the purposes being to assess whether the father needed treatment for domestic violence, substance abuse, or mental health.

**2. "[W]hether [DCF] has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended"— § 17a-112 (k) (2).**

DCF made reasonable efforts to reunite Noah with his father. It offered him regular visitation except for the period of the protective order and referred him to various reunification services.

**3. "[T]he terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order"—§ 17a-112 (k) (3).**

The specific steps ordered when children are removed from parental custody or committed to the department inform the parent of the actions that the parent needs to take to regain custody and avoid termination of their parental rights. As the Appellate Court noted in *In re Shane M.*, 148 Conn. App. 308, 329, 84 A.3d 1265 (2014), aff'd, 318 Conn. 569, 122 A.3d 1247 (2015), "[t]he specific steps are a benchmark by which the court will measure the respondent's conduct to determine whether termination is appropriate pursuant to § 17a-112 (j) (3) (B)." (Internal quotation marks omitted.) See also *In re Stephen M.*, 109 Conn. App. 644, 661, 953 A.2d 668 (2008) (same). Specific steps were ordered on several occasions[6] for Mr. R.-M. to undertake

---

[6] The only specific steps introduced into evidence were those ordered by this judge on December 5, 2022, after approving a permanency plan for termination of parental rights and adoption. The court is also taking judicial

in order to facilitate the return of Noah to his custody, and he has complied as set forth below and as otherwise detailed in this decision:

• ***Keep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child(ren)'s court-appointed attorney and/or guardian ad litem.***

Mr. R.-M. participated in at least two departmental administrative case reviews, but would not agree to allow DCF to conduct home visits without his attorney being present.

• ***Keep whereabouts known to DCF, the child's attorney and your attorney.***

Father generally complied, although one time he did not promptly notify the department of changing his address.

• ***Keep DCF apprised of any changes in the composition of your household members.***

Mr. R.-M. has complied with this step and notified the department when the mother and he did and did not reside together.

• ***Take part in parenting and individual counseling, make progress toward the identified treatment goals, and cooperate with recommended service providers.***

The preliminary specific steps ordered at the time of the ex parte OTC on October 19, 2021, directed Mr. R.-M. to participate in individual therapy at Wheeler Clinic or another provider and to participate in parenting services. The goals identified on the specific steps form were for him to demonstrate appropriate coping skills and safe and appropriate parenting abilities. The final

notice of the contents of the specific steps entered as part of the underlying § 46b-129 proceeding.

specific steps ordered upon Noah's adjudication as neglected and his commitment on July 20, 2022, again ordered Mr. R.-M. to participate in parenting and individual counseling. The final specific steps form identified the [QPC] at the Village for supervised visitation and parenting services, fatherhood engagement services through the Village, and [CHR] for parenting, mental health and or substance use assessments. The July 20, 2022 final specific steps amended his goals in counseling by adding for him to "provide home free of violence/abuse that meets child's needs."

When DCF first began investigating Noah's injuries, Ms. R. told social worker investigator Paramentier that after dating the father for five months she had intended to end their relationship, which she described as having a "lot of arguments when they were both jealous of each other" although, she claimed, without any violence. Ex. A, p. 6. She said that, "when she found out she was pregnant, she and father had decided to try to make it work as they were going to have a baby" but the relationship since then had been "very stressful" since father often did not have stable employment. Id. She also told Paramentier that she had been in the process of signing a new lease for a different apartment where she would live just with Noah and the father would live elsewhere. She made similar statements at CCMC ("Living situation: Child shares a home with his mother and father. . . . Mother and father will be leaving their current home at the end of this month. Mother will be renting her own apartment . . . and father reports he will most likely move in with his mother." Ex. L, p. 4). Despite those statements, however, the parents continued to live together until Mr. R.-M. was arrested on the charges relating to Noah's injuries.

The first therapist that the parents saw at CHR contacted DCF on the day that Mr. R.-M. was arrested. The therapist said that, "during therapy sessions, Ms. [R.]

discussed being a victim of intimate partner violence." She told the therapist that she had ended her relationship with Mr. R.-M. upon his arrest. She also told the therapist that she had been afraid to leave Mr. R.-M. "because she felt she needed him since she did not know English well." Ex. C, p. 11. The therapist told DCF that Ms. R. had said that she needed help obtaining housing that was separate from Mr. R.-M. Ms. [R.] had also "reported Mr. R.-M. was stalking her on social media and she reported blocking him from contacting her." The therapist told the department that, when she encouraged Ms. [R.] to contact the police department regarding the stalking, "she reported to her therapist . . . that Mr. [R.-M.] threatened to have her deported if she reported him to the police department." Id. When the therapist called Ms. R. to provide her with information on intimate partner violence services, the therapist heard Mr. R.-M.'s voice in the background, and when the therapist attempted to address that with Ms. [R.], she put the phone on mute and insisted Mr. R.-M. was not there. Id. The therapist told DCF that Mr. R.-M. "[appeared] to be obsessed" with Ms. R., even to the point of one time showing up at CHR during her appointment time. Id., 7.

Neither the October, 2021 nor the July, 2022 specific steps contained any orders regarding intimate partner violence. For example, the boxes on the specific steps form to cooperate with restraining or protective orders or DCF safety plans, to attend and complete an appropriate domestic violence program, and to address intimate partner violence issues with a qualified therapist were not checked on either order. After the department had obtained the information recited above about intimate partner violence in the parents' relationship, the court amended the order of final specific steps on December 5, 2022. A copy of those specific steps was entered into evidence as exhibit H. They included new

orders for Mr. R.-M. to cooperate with any restraining or protective order or DCF-approved safety plans, to attend and complete an appropriate domestic violence program, and to address intimate partner violence/ domestic violence with a qualified therapist. The goals of his parenting and individual counseling were revised to include that he should "demonstrate an understanding of how intimate partner violence and physical abuse impacts the child." A new service provider was identified for him, Radiance-Innovative Services for Intimate Partner Violence Offenders Services.

**Mental health treatment**: Mr. R.-M. did not consistently attend or benefit from the individual therapy ordered in the specific steps. He began therapy at CHR in April, 2022, but stopped attending after two months. After a six month lapse, he resumed therapy at CHR in mid-September, 2022. His CHR sessions were modified to biweekly in mid-February, 2023. Between September, 2022, and April, 2023, he missed seventeen of his appointments. In April, 2023, his therapist at CHR told DCF that her sessions with Mr. R.-M. were going to end and there would be a gap in services for approximately six weeks while another therapist was assigned, but Mr. R.-M. did not resume therapy. He told DCF that he stopped attending because he expected to be incarcerated soon. Dr. Schroeder, who conducted the court-ordered psychological evaluation, concluded that he made only limited progress in his therapy because he is "hard to engage," has difficulty trusting his therapist, and had attended therapy intermittently. She also reported that he frequently blames other people for his own problems, struggles to accept responsibility for his actions, and has difficulty accepting critiques of his actions. The contents of her evaluation contained in exhibit I and its conclusions are consistent with the other evidence about Mr. R.-M. and are found to be credible.

**Domestic violence/intimate partner violence services**: The Radiance program mentioned in the specific steps is one that requires participants to refer themselves. DCF gave him information about that program, but Mr. R.-M. never went there. Later, DCF referred him and Ms. R. to CHR's IPV Fair program, which works separately with both members of a couple experiencing intimate partner violence, but one requirement of that program is that participants admit to having experienced such issues in their relationship. Mr. R.-M. has always denied any violence or issues of coercive control in that relationship. He did tell DCF that he was willing to participate in the program, however, as did Ms. R., but initially neither of them was willing to acknowledge domestic violence as an issue. In October, 2023, Ms. R. admitted to her therapist and DCF that coercive control was a component of her relationship with Mr. R., and the following month she filed for and obtained a restraining order against him, which was extended in July, 2024, for another year. While that restraining order has been in effect, Mr. R.-M. has repeatedly contacted her in violation of the order. Mr. R.-M. never began any services at CHR IPV Fair before he was imprisoned. The evidence shows that he has made no progress on addressing these issues.

**Parenting Services**: DCF referred Mr. R.-M. to the supervised visitation program at the [QPC], where he participated between November, 2021, and May, 2022. A protective order then prevented him from having any contact with Noah until November, 2022, when DCF was allowed to supervise his visits, after which it provided weekly visits until he was incarcerated. He also attended and completed fatherhood engagement services at the Village between May and August of 2022. Social worker Westerman testified that he is always appropriate and affectionate during his visits with Noah. She said that Noah appears comfortable with Mr.

R.-M., but not bonded with him. Westerman said that, until Mr. R.-M. was incarcerated in February, 2024, he had been having weekly visitations for "the better part of a year" without concerns. Dr. Schroeder observed him interacting with Noah as part of her evaluation, and she commented that "he offered some positive elements of parenting that included engagement, support, nurturance, grooming, and items for play. . . ." Ex. I, p. 27.

- ***Submit to substance abuse assessment and follow treatment recommendations; submit to random drug testing if recommended; do not use illegal drugs or abuse alcohol or medicine.***

DCF never asked Mr. R.-M. to engage in a substance abuse assessment. The August, 2023 MRP social study said he always appeared sober during interactions with the department and that DCF had no concerns related to substance abuse on his part. See ex. E, p. 8.

- ***Accept and cooperate with in-home support services referred by DCF and make progress toward treatment goals.***

DCF did not offer or refer the father to any "in-home support services."

- ***Cooperate with any active protective or restraining orders; avoid more incidents of domestic violence; attend and complete a domestic violence program; address intimate partner violence issues with a qualified therapist.***

The father did not comply. After Ms. R. obtained a restraining order against him, he repeatedly contacted her in violation of the terms of that order. He never attended or completed a domestic violence program.

- ***Visit with the child(ren) as often as DCF permits and demonstrate appropriate parent/child interaction during visits.*** Father has complied.

• ***Cooperate with child's therapy.*** Not applicable here.

• ***Get and/or maintain adequate housing and legal income.***

The evidence on this is ambiguous. Mr. R.-M. told DCF that he was employed, but DCF was never able to verify his work status and when it asked him in April, 2023, to provide a copy of his job schedule, he did not do so (at least through August, 2023, which is the last date on which the court has evidence about this issue). See ex. E, p. 8. He did provide DCF with the addresses at which he was residing.

• ***Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals and for use in future proceedings before this court.*** Father complied.

• ***Immediately let DCF know about any changes in the makeup of the household to ensure that the change does not hurt the health and safety of the child(ren).*** Father complied.

• ***No involvement in the criminal justice system. Comply with probation or parole.***

Father did not comply. On December 23, 2022, he was arrested for larceny in the second degree, a class C felony, for stealing merchandise from his employer.

• ***Cooperate with court-ordered evaluations or testing.*** The father cooperated with the court-ordered psychological evaluation.

• ***Keep child(ren) in the state of Connecticut while case is going on unless you get advance permission from DCF or the court.*** Not applicable since child is in DCF custody.

• ***Supply names and addresses of grandparents and of persons the parent would like DCF to consider as a placement resource.*** Father complied.

**4. "[T]he feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties"—§ 17a-112 (k) (4).**

Noah has not been in Mr. R.-M.'s custody since the child was two months old. The child apparently has no memory of his injuries, and he is reported by social worker Westerman to be comfortable with and unafraid of Mr. R.-M. during visitations. In its March, 2023 TPR social study, the department acknowledged that, as of that point, Noah had "a close emotional tie" to both of his parents. Ex. D, p. 21. Since Noah had seen his father weekly for the past year as of the time of trial and Mr. R.-M. is reported to be affectionate and appropriate during those visitations, Noah still probably has positive feelings for and emotional ties to Mr. R.-M. Noah is closely bonded with his foster mother, however, and has lived with her since approximately one month after his removal from parental care in late 2021.

**5. "[T]he age of the child"—§ 17a-112 (k) (5).**

Born on August 18, 2021, Noah was three years and eight months old at the time of trial and is now four years and four months old.

**6. "[T]he efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the**

**child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child"—§ 17a-112 (k) (6).**

Mr. R.-M. attended some of the services to which the department referred him and that were intended to address the reasons that Noah was removed and kept from his parents' custody. As discussed above, however, he did not make significant progress toward addressing his mental health issues and never undertook any domestic violence services. He had regular contact with Noah through the QPC supervised visitation program and DCF supervised visits except for the six month period when the criminal protective order prohibited contact.

**7. "[T]he extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent"—§ 17a-112 (k) (7).**

There is no evidence of any unreasonable acts or conduct on the part of anyone or of either parent's economic circumstances interfering with the ability of either one to have a meaningful relationship with Noah.

**B**
**Best Interest of The Child**

The final element of the termination of the parental rights statute, § 17a-112 (j), requires that, before granting a petition for such termination, the court must find "by clear and convincing evidence that . . . (2) termination is in the best interest of the child . . . ." The best interest standard is inherently flexible and fact

specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare. In determining that terminating Mr. R.-M.'s parental rights is in Noah's best interest, the court has considered numerous factors, including "the child's interest in sustained growth, development, well-being, and in the continuity and stability of [his] environment"; *Capetta* v. *Capetta*, 196 Conn. 10, 16, 490 A.2d 996 (1985); his age and needs; the length of his time in foster care; the contact he had with his parents after removal; the potential benefit or detriment of Noah retaining a connection with his biological father; his genetic bond to his father; see, e.g., *In re Savanna M.*, 55 Conn. App. 807, 816, 740 A.2d 484 (1999); his needs for permanency and stability; see, e.g., *In re Davonta V.*, 285 Conn. 483, 493–95, 940 A.2d 733 (2008); and the seven statutory factors and the court's findings thereon. The court has also balanced Noah's intrinsic needs for safety, stability and permanency against the potential benefit of maintaining a legal connection with his biological father. See *Pamela B.* v. *Ment*, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against interest in preserving family integrity), abrogated on other grounds by *Gold* v. *Rowland*, 296 Conn. 186, 994 A.2d 106 (2010).

When the underlying neglect petition was filed, Noah was only two months old. By the time of trial three plus years later, he was nearing four years of age. Since removal from his parents' custody, he lived for a month in nonrelative foster care and ever since then he has resided in foster care in the home of his paternal aunt, Mr. R.-M.'s sister, whom the department has identified as a potential adoptive resource. Despite his early and severe injuries, he today shows no residual effects of what happened. He has no known medical or developmental issues. Because he is not yet talking much, the

foster family arranged for him to be evaluated by Birth-to-Three services, which found no developmental problems.

Noah is thus like most other children his age. He has the same needs as they do for necessities and material goods such as food, clothing, and shelter. The evidence about the father's work history is sketchy, but nothing in the evidence suggests that Mr. R.-M. could not meet these types of needs. All children also need medical care, and the father's history of overlooking his child's many injuries, combined with his doubts about whether his son was even injured, raise serious doubt about Mr. R.-M.'s willingness or capacity to meet this need. Like all children of his age, Noah also has the more intangible needs such as for love, guidance, safety, stability, consistency, and permanency. He needs caretakers who will nourish him and guide him toward reaching his maximum potential. The evidence suggests that Mr. R.-M. loves his child, and the information about his interactions with Noah during visitations and the interactional session that was part of the court-ordered psychological evaluation shows that Mr. R.-M. knows how to and is able to interact positively and affectionately with his child during those sessions.

One of a parent's paramount obligations, however, is to do his best to keep his child safe and not to harm his child. During the first two months of his life, Noah was injured on numerous occasions and when examined by CCMC doctors was found to have twenty-one fractures that had occurred on different occasions over at least a one month period. These fractures were all over his body—a fracture to his right collarbone that was more than two weeks old (and according to Dr. Livingston possibly a birth injury); a possible healed fracture of one of his right ribs; a fracture of unknown age to his right upper arm; two fractures of both his right and left forearms, all more than two weeks old and

"most likely around [four] weeks old"; four fractures to the bones in his right hand, one of uncertain age and the others more than ten days old; fractures to the third and fourth fingers of his right hand that were more than ten days old; fractures to his right tibia (shin) and right fibula (described in Dr. Livingston's letter as "the other lower leg bone next to the tibia," both "most likely [two to four] weeks old"; three fractures on his left foot that were more than ten days old; two fractures of his left thigh, one less than ten days old and which "most likely occurred on day of presentation" (the fracture reported on October 21) and the other "most likely more than [four] weeks old"; and a fracture to the left tibia that was probably between two and four weeks old. The injuries that resulted in these fractures would have been painful to Noah and resulted in pain responses such as crying or screaming. Ex. A, p. 12. Bruises from some of these injuries were still evident when the CCMC doctors evaluated him. Dr. Livingston told DCF that normal handling of a child would not have caused these injuries and that medical examination and tests had found no cause for them, leading her initially to characterize them as "highly suspicious for inflicted injury." Id. After conducting a follow-up assessment of Noah a year later, Dr. Livingston reported to the department that "Noah had a normal follow up physical and developmental exam. No radiological evidence of fractures was noted. Noah is now walking/falling with no additional fractures or interval disease in the past year. This is strong evidence of normal bone health. . . . Noah's injuries are *diagnostic for inflicted injury*." (Emphasis added.) Ex. D, p. 9.

Mr. R.-M. has repeatedly denied causing these injuries—to DCF, to the police, to Dr. Schroeder during the psychological evaluation, and at trial on the TPR petition. He did plead guilty to and has been convicted of the charge of risk of injury based on those injuries,

however. He testified at trial here that he had pleaded guilty to that charge only because he had also been arrested on a larceny charge, was "offered a deal that involved pleading to both charges," and had faced a possible sentence of five to ten years of incarceration if he was convicted after trial but had been offered a sentence of seven years [of] incarceration suspended after eighteen months if he pleaded guilty to both charges. See trial transcript, p. 71. The petitioner's trial brief appeared to regard his guilty plea and conviction as tantamount to establishing that he had in fact inflicted those injuries on his son. See, e.g., Petitioner's posttrial brief, pp. 2–3. The respondent's posttrial brief, however, asserted that he had entered his guilty plea under the *Alford* doctrine.

The law is clear that there are differences between a straight guilty plea,[7] a plea of nolo contendere,[8] and

---

[7] A criminal defendant who enters a regular guilty plea admits having committed the charged offense. A court may accept a guilty plea only upon finding that there is a factual basis for such a plea. See Practice Book § 39-21 (captioned "Factual Basis for Plea," stating [that] "[t]he judicial authority shall not accept a plea of guilty unless it is satisfied that there is a factual basis for the plea").

[8] "A plea of nolo contendere is distinct from a plea of guilty inasmuch as the latter may be regarded as a verbal admission by the accused, and, as such, may be admissible in subsequent civil proceedings. It does not, however, conclusively establish negligence, and the accused is not precluded from explaining his plea. . . . By contrast, a plea of nolo contendere is merely a declaration by the accused that he will not contest the charge, and even though followed by a finding of guilty and the imposition of a fine or other penalty, is not admissible, either as a verbal admission or an admission by conduct. . . . Nor is it admissible to affect a party's credibility, as evidence of an arrest, or as res judicata establishing that the plaintiff was engaged in a criminal act. . . . Pleas of nolo contendere may be entered for reasons of convenience and without much regard to guilt and collateral consequences. . . . Even though the plea may be regarded as a tacit admission, its inconclusive and ambiguous nature dictates that it should be given no currency beyond the particular case in which it was entered." (Citations omitted; internal quotation marks omitted.) *Lawrence* v. *Kozlowski*, 171 Conn. 705, 711–12 n.4, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). Unlike a straight guilty plea, a plea of nolo contendere does not require that the trial court find a factual basis for

an *Alford* plea.[9] Whether his conviction in the criminal

the plea. As explained in *State* v. *Godek*, 182 Conn. 353, 364, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981): "In [*Alford*] . . . Justice White succinctly pointed out the distinction between a guilty plea and a nolo contendere plea, and why a factual basis may not be desirable for the acceptance of the latter. In his majority opinion, he explained that: Throughout its history . . . the plea of nolo contendere has been viewed not as an express admission of guilt but as a consent by the defendant that he may be punished as if he were guilty and a prayer for leniency. Fed. Rule Crim. Proc. 11 preserves this distinction in its requirement that a court cannot accept a guilty plea unless it is satisfied that there is a factual basis for the plea; there is no similar requirement for pleas of nolo contendere, since it was thought desirable to permit defendants to plea nolo without making any inquiry into their actual guilt . . . ." (Internal quotation marks omitted.)

We agree with the distinction made by Justice White in *Alford* and by the federal rules and hold that, although our own rules may be unclear, a factual basis is not required to be established to accept a nolo contendere plea.

[9] See *White* v. *Commissioner of Correction*, 145 Conn. App. 834, 847–48 n.3, 77 A.3d 832, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013) ("Under *North Carolina* v. *Alford*, [400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970)], a criminal defendant is not required to admit his guilt, but consents to being punished as if he were guilty to avoid the risk of proceeding to trial. *Commissioner of Correction* v. *Gordon*, 228 Conn. 384, 385 n.1, 636 A.2d 799 (1994). A guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless. *State* v. *Palmer*, [196 Conn. 157, 169 n.3, 491 A.2d 1075 (1985)]. In [*Alford*], the United States Supreme Court treated such guilty pleas as the functional equivalent of a plea of nolo contendere. *State* v. *Rish*, 17 Conn. App. 447, 456, 553 A.2d 1145, cert. denied, 211 Conn. 802, 559 A.2d 1137, cert. denied, 493 U.S. 818, 110 S. Ct. 72, 107 L. Ed. 2d 38 (1989). Our Supreme Court has indicated that [a] plea of nolo contendere has the same legal effect as a plea of guilty on all further proceedings within the indictment. . . . The only practical difference is that the plea of nolo contendere may not be used against the defendant as an admission in a subsequent criminal or civil case. . . . *State* v. *Martin*, 197 Conn. 17, 20–21 n.7, 495 A.2d 1028 (1985). Our Supreme Court has also indicated that a factual basis is not required to be established to accept a nolo contendere plea. *State* v. *Godek*, 182 Conn. 353, 364, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981). In 1989, this court concluded in *Rish* that [a]s a guilty plea under the *Alford* doctrine is the functional equivalent of a plea of nolo contendere, an *Alford* plea may not be used against the defendant as an admission in a subsequent civil case. *State* v. *Rish*, supra, [456]. Likewise, in 2002, this court concluded that as *Alford* pleas and pleas of nolo contendere [are] the functional equivalent

proceeding could be considered as proof in this proceeding that he committed those injuries is a significant fact, and the court thus sought, as necessary for a well reasoned decision, additional posttrial briefs from the parties on whether a guilty plea under the *Alford* doctrine or a subsequent conviction would have any legal or factual significance in this proceeding. The last of those briefs was filed on December 13, 2024. All parties have agreed that the court should take judicial notice of the criminal proceedings,[10] and the court has accordingly taken judicial notice that the respondent father's [plea of] guilty to the risk of injury charge was under the *Alford* doctrine. Upon review of the parties' briefs and after conducting its own research, the court concludes that the law in Connecticut is unclear on the significance of his plea and conviction in this proceeding.[11] In view of our Supreme Court's statement that

of one another . . . a factual basis is not required for *Alford* pleas . . . . *Baillargeon* v. *Commissioner of Correction*, 67 Conn. App. 716, 730 n.11, 789 A.2d 1046 (2002). A court may nevertheless, in its discretion, require a factual basis before accepting a nolo contendere or *Alford* plea. Id., 730 n.10; see also *State* v. *Godek*, supra, 365 n.13. (Internal quotation marks omitted.))

[10] See the petitioner's supplemental posttrial brief, pp. 2–3; the respondent father's motion for judicial notice, dated December 13, 2024; and the letter from the child's counsel dated December 13, 2024, adopting the petitioner's position.

[11] The commissioner's brief argues that the court may treat the father's *Alford* plea "as if he had pled guilty to the risk of injury charges." Petitioner's supplemental posttrial brief, p. 2. It cites the case of *State* v. *Faraday*, 268 Conn. 174, 842 A.2d 567 (2004) as support for that proposition. *Faraday* is one of a series of cases holding that an *Alford* guilty plea may be used, in subsequent proceedings for violation of probation, to establish "that a conviction following a jury verdict is indistinguishable from a conviction following a guilty plea or *Alford* plea for purposes of eliminating any controversy over whether the criminal conduct underlying a violation of probation has occurred." *State* v. *T.D.*, 286 Conn. 353, 366, 944 A.2d 288 (2008). On the other hand, in *State* v. *Solomon*, 150 Conn. App. 458, 469–72, 91 A.3d 523, cert. denied, 314 Conn. 908, 100 A.3d 401 (2014), the court held that the trial court had erroneously allowed admission of a party's guilty plea under the *Alford* doctrine to the offense of criminal possession of a firearm to establish, in a civil proceeding, that the same individual had admitted knowing possession of that firearm. The respondent father's supplemental posttrial brief in the present case correctly points out that § 4-8A (a) (2) of

the "inconclusive and ambiguous nature" of an *Alford* plea "indicates that it should be given no currency beyond the particular case in which it was entered"; (internal quotation marks omitted) *Lawrence* v. *Kozlowski*, 171 Conn. 705, 712 n.4, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); this court will not regard the father's plea and conviction as evidence that he inflicted the injuries on Noah.

Nonetheless, all these injuries happened to Noah while he was in Mr. R.-M.'s (and Ms. R.'s) care. On numerous occasions during Noah's second month of life, this child was repeatedly injured. Dr. Livingston's opinion that these injuries were "inflicted," which this court finds credible, means that someone was causing the injuries to Noah. He would have cried each time. The parents both told DCF that Noah had cried a lot during that month. Someone in that household or caring for Noah was injuring him, repeatedly, so harshly as to break the baby's bones, but his parents were ignoring his cries of pain. Mr. R.-M. was living in a home where his own baby was repeatedly injured and would have been crying out from those injuries. During the psychological evaluation, moreover, he even "questioned whether his son really suffered [twenty-one] fractures as he has no lasting problems." Ex. I, p. 16.

The facts proven at trial here—that Mr. R.-M. continues to deny having committed those injuries and to question whether they actually occurred—show that he

the Connecticut Code of Evidence expressly provides that an *Alford* plea itself or any statements Mr. R.-M. made in connection with that plea are inadmissible in any other proceeding. See Conn. Code Evid. § 4-8A (stating as follows: "(a) Prohibited Uses. Evidence of the following shall not be admissible in a civil or criminal case against a person who has entered a plea of guilty or nolo contendere in a criminal case or participated in plea negotiations in such case, whether or not a plea has been entered . . . (2) a plea of nolo contendere or a guilty plea entered under the *Alford* doctrine or any statement made in conjunction with such a plea").

continues to pose a safety risk to his son in unsupervised settings. Since he did not admit causing the injuries, there is no way of knowing for sure who inflicted these injuries on his son, and, if Mr. R.-M. was the one who did so, whether he had acted intentionally or negligently, out of rage, sadistic pleasure, or carelessness. But his unwillingness to recognize ***both*** that Noah had been injured ***and*** that somebody had inflicted those injuries on Noah shows that he is not today prepared or able to keep his son safe in his care.

Our courts have long held that "the failure to acknowledge and make progress in addressing the issues that led to a child's removal may be one of many contributing factors to a court's determination that a parent has failed to achieve a sufficient degree of personal rehabilitation." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 492, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). Similarly, a parent's continued unwillingness to accept responsibility for the reasons a child was found to have been neglected and committed to DCF "reasonably may bear on whether reunification or termination of parental rights is in the child's best interest." *In re Allison G.*, 276 Conn. 146, 164, 883 A.2d 1226 (2005). "In abuse and neglect cases, it is well established that the failure to accept responsibility reasonably may be considered as an indication that there is a risk that the abuse will continue." *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 566, 964 A.2d 1213 (2009). Even if Mr. R.-M. was not the person who inflicted those injuries on his son, Mr. R.-M. was one of the two people responsible for keeping Noah safe and protecting him from harm. He did not meet that responsibility, and his son was repeatedly injured as a result. Even if it was possible that Mr. R.-M. had been unaware during that month that his son was repeatedly being injured, and probably crying out from those injuries, his refusal now to

acknowledge those injuries shows that he does not accept responsibility for not having paid enough attention to his child then to notice what was happening and had happened to his son. If he had paid enough attention, maybe he could have protected his child from any or more injuries or sought medical care sooner. His refusal now to acknowledge that his son was hurt so badly and so many times also shows a fundamental lack of concern about his son's safety or welfare.

The case of *In re Egypt E.*, 327 Conn. 506, 175 A.3d 21, cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children and Families*, 586 U.S. 818, 139 S. Ct. 88, 202 L. Ed. 2d 27 (2018), presents somewhat different facts but discusses the same implications of not accepting the significance of injuries to a child in the parent's care. In that case, a seven week old child was found by doctors to have incurred numerous fractures and bruises while in the parents' care. The commissioner then brought petitions to terminate the parents' parental rights to that child and her sibling. Initial judgments in favor of the commissioner were overturned on appeal, and a new trial ordered. See *In re Egypt E.*, 322 Conn. 231, 140 A.3d 210 (2016). On the final day of the second trial, the respondent father " 'reluctantly' admitted responsibility for the injuries . . . ." *In re Egypt E.*, supra, 327 Conn. 522. The trial court noted that his "admission was unacceptably general and still evinced *an unwillingness to face the details of what had occurred.*" (Emphasis added.) Id. At that trial, the respondent mother testified that, "although for the prior three years she had been unsure about what had happened to Mariam, she now acknowledged that [the father] had inflicted the child's injuries." Id., 521. The trial court concluded that "neither of the respondents, at present, *seemed to comprehend why removing Egypt from the home was necessary to protect her,* instead cling[ing] to the fact that Egypt was

uninjured as a way *to protect themselves from the awareness of the truth of Mariam's significant injuries and their failure to provide safety for both children.*" (Emphasis added.) Id., 522. In affirming the trial court's decision to terminate the respondents' parental rights, our Supreme Court noted the trial court's findings as follows: "The trial court found that [the mother] had taken no action to inform herself about Mariam's injuries, that she could not confront the truth and that she had made 'absolutely no progress' toward the goal of learning how to keep her children safe. It found further that [the mother's] failure to acknowledge what had occurred meant that she could not be safely reunited with her children. The court found that [the father] similarly could not comply with the specific steps that he had been given. As the court explained, '[b]oth parents in their own individual ways demonstrate a remarkable capacity for self-deception. Even as each admitted [that] he or she now was ready to acknowledge [the father] as the source of the injuries to Mariam, each stated that awareness in very similar detached words. Such observable . . . lack of candor keeps them, the court concludes, from putting the needs of their children first, admitting their faults and thereby permitting the possibility of careful reunification with their children.

" 'This is the fatal flaw that has prevented reunification throughout these lengthy proceedings. It is at the heart of [the respondents'] inability and unwillingness to benefit from the services offered to them. It means that their children, even now, could not reasonably and safely be returned to them.' " Id., 522–23.

Similarly, the father's stated doubts here about whether these injuries even occurred show his "unwillingness to face the details of what had occurred." They show that he does not understand and accept why

removing Noah from his custody was necessary to protect his son. The doubt that he expressed about Noah actually being injured, despite the documented medical proof, is, just as *In re Egypt E.*, a way of protecting himself from an awareness of Noah's many, significant injuries and, regardless of whether he was the one inflicting those injuries, of his own failure to keep his child safe. Here, as in that case, expressing those doubts shows an unwillingness to put the needs of his son first. Those doubts also explain why he made so little progress in his mental health treatment. His failure to acknowledge his responsibility for not having protected his son means that he could not safely be reunited or even left unattended with Noah.

The posttrial brief submitted by the respondent father acknowledges that the state has a legitimate interest in safety, stability, and permanency: "[W]here a court interferes with a child's relationship with his parent, it must do so only to keep that child safe, stable, and prospering." Father's posttrial brief, pp. 5, 7. That brief argues that withdrawal of the TPR petition as to the mother means that [the] termination of the father's parental rights to Noah would not advance the child's interest in permanency. Whether permanency for Noah would be obtained through adoption by the current foster mother or reunification with the biological mother was, the brief maintained, unclear as of the end of the current trial. That brief thus asserts that "termination is unnecessary" to further the government's legitimates interests here. See id., p. 5. That assertion ignores the fact, however, that termination does further both the state's and the child's legitimate interests, statutory grounds for termination having been established, in the child's safety and well-being.

Without expressly so arguing, the father's brief implies that the court should import a "least restrictive means analysis" into the current determination as to

whether termination is in Noah's best interest. See id., p. 7. Although our appellate courts have never adopted a least restrictive requirement for TPR proceedings, and the meaning of such a standard when applied to a termination proceeding is not clear, safety of the child would surely be a minimum requirement for applying any such analysis.

Not terminating Mr. R.-M.'s parental rights would mean that he maintained the legal right to seek revocation of commitment and return of the child to his care and, even if the child were in the care and custody of someone else, visitation with Noah. The court agrees with the position argued by the commissioner that "termination can aid stability and lessen disruption for abused and neglected children by preventing unfit parents from subjecting them to further litigation." Petitioner's posttrial reply brief, p. 3, citing *In re Davonta V.*, supra, 285 Conn. 495–96 (stating as follows: "[e]ven if no adoption is forthcoming, termination can aid stability and lessen disruption because a parent whose rights have been terminated no longer may file a motion to revoke the commitment of the child to the custody of the commissioner . . . or oppose an annual permanency plan" (citation omitted)).

The number of injuries to Noah makes it likely that someone with regular access to him was the one causing the injuries. The evidence shows that Noah did have other caretakers than the parents during the month long period when the injuries occurred. (The maternal grandmother is the only such person mentioned in the OTC affidavit, as she told DCF that she "cares for said infant "Monday–Thursday and every other Saturday from 6:30 p.m. to 4:30 p.m." Ex. A, p. 11.) CCMC could not date the precise time for the older injuries, but that was not the case for the fractured leg that led the parents to take Noah to the doctor on October 25. According to CCMC's Dr. Friedman, "given the injury

to this baby's leg, she believed said infant would have experienced swelling immediately." Id., 6. The bone in Noah's femur "was broken into several pieces." Id., 3. The injury "was most likely to have been caused by a blow to his left posterior left femur." Id. Mr. R.-M. even acknowledged that when changing Noah's diaper he "noticed his left leg was swollen and knew there could be something wrong [and] he could feel bones inside his son's leg crunching when he touched them." Id. Dr. Livingston also agreed that, based on the parents' reports of Noah's symptoms, the injury that led to his hospitalization "most likely occurred on the day of presentation." Ex. L, p. L-12. Both parents having repeatedly said that they were the only ones taking care of Noah in the hours just before they noticed his swollen leg, their statements lead, in light of the doctor's opinions of its recency, to the inescapable conclusion that one (or both) of them had caused that injury.

The father's nolo contendere plea removed the necessity to prove the adjudicatory allegations by clear and convincing evidence in the adjudicatory phase of the proceeding to establish statutory grounds for termination. For the dispositional purposes of deciding whether termination has been proven to be in Noah's best interest, however, it is highly significant in this case that the factual information contained in the exhibits offered at trial proved clearly and convincingly that the adjudicatory allegations here, even if unnecessary to be proven in the adjudicatory phase, were nonetheless both true and essential to the dispositional decision: that Mr. R.-M. has not addressed the reasons that Noah was removed from his care; that he did not meaningfully engage in many of the necessary rehabilitative services offered to offer a possibility of reunification; that he was unwilling and unable to benefit from many of the reunification services offered by the department and ordered by the court; that he was not ready at the time

of trial to assume a responsible position in Noah's life and will not be ready to do so for the foreseeable future, a fact he conceded in his own testimony;[12] and that, by acts of omission or commission on his part that while the child was in his care and custody, he denied Noah, even if he did not cause those injuries, the guidance and control necessary for the child's physical well-being. Although the focus of the dispositional phase is the child's best interest, here the parent's conduct is highly significant to that decision. The specific facts that underlie and prove the adjudicatory allegations to be true support the conclusion that termination is in Noah's best interest. Compliance with specific steps intended to help a parent address the reasons they lost custody of their child provides the court with a nonbinding benchmark or guideline on whether termination is appropriate, and Mr. R.-M.'s failure to take the orders contained in the specific steps further supports a finding that termination is in Noah's best interest.

Mr. R.-M.'s unwillingness to acknowledge that Noah suffered these injuries shows no awareness of how serious they were or his responsibility for not causing or preventing them and for not noticing them earlier and seeking medical care sooner. It is thus not surprising that for the first few months of his mental health treatment, he rarely discussed the injuries to Noah, showed no emotion when he did discuss them, but instead focused on Ms. R. His second therapist also reported that for at least the first two months of that therapy he again did not discuss the injuries to Noah.[13]

---

[12] On direct examination, Mr. R.-M. was asked the following question by his attorney and gave the following answer:

"Q. So, I want to turn to talk to you a little about Noah. From what you've said, it seems pretty clear that you're not going to be around for him any time soon.

"A. Correct." Trial transcript, pp. 71-72.

[13] "On 09/14/22, Mr. [R.-M.] re-engaged in mental health services through CHR and was assigned to Sarah Hermonot. Mr. [R.-M.] has been attending therapy regularly since 09/14/22. Prior to the Administrative Case Review held on 11/22/22, Mr. [R.-M.] was not discussing Noah during his therapeutic

Someone unwilling to notice for so long or to acknowledge that his child was injured is unlikely to benefit from services that could prevent the recurrence of such conduct in the future. The evidence showed that Mr. R.-M. was not willing to participate meaningfully in many of the services offered by DCF or to which the department referred him in accordance with the specific steps. He did not attend counseling consistently and, even though he eventually agreed to participate in CHR's domestic violence program, IPV Fair, he was not willing to admit that intimate partner violence was an issue in his relationship with Ms. R. Just as in the *In re Egypt E.* case, the respondent's inability and unwillingness to benefit from services means that Noah would not be safe in his care. Although the father's brief argues that termination "deprives [Noah] of a potentially beneficial future relationship"; p. 5; there could be no "potentially beneficial future relationship" with someone who continues to pose a safety risk because of an unwillingness to accept responsibility and seek personal change. The father essentially asks the court to speculate, without any evidentiary basis, that someday he will be willing to accept his own responsibility for what happened to Noah and his failure to have protected his son.

Noah's best interest should not and does not rely on such speculation, however. His best interest lies in orders that secure his interest in being safe and advance his needs for stability and permanency. Terminating Mr. R.-M.'s parental rights removes barriers to permanency for Noah and directly furthers Noah's interests in safety and security. The commissioner proved clearly and convincingly that termination of the respondent father's parental rights is in Noah's best interest.

sessions." Ex. D, Social Study in Support of Termination of Parental Rights, p. 7.

## V
## ORDERS

The court having accepted the father's nolo contendere plea to the adjudicatory allegations, the court having further determined that the adjudicatory allegations in the petition provide a valid and sufficient factual basis for the necessary adjudicatory findings and having considered all the evidence offered at trial and further found by clear and convincing evidence that the adjudicatory allegations were proven to be true and that, upon consideration of all of the facts and circumstances presented, that it is in Noah's best interest to terminate the parental rights of the respondent, it is hereby ORDERED:

The commissioner's petition for termination of the parental rights of the respondent Jorge R.-M. to his minor child Noah is hereby GRANTED, and judgment may enter terminating his parental rights to this child.